Janet JONES and Ronald
Jones, Appellants,

v.

Stephen K. OVERSTREET, M.D.; Stephen K. Overstreet, M.D., PLLC.; and Humana Insurance Company, Appellees.

No. 2010–CA–000920–MR.

Court of Appeals of Kentucky.

Aug. 12, 2011.

Discretionary Review Denied by Supreme Court Aug. 15, 2012.

Paul A. Casi, II (argued), Kevin C. Burke, Louisville, KY, for appellants.

Scott P. Whonsetler, Robert A. Ott, Bradley R. Hume (argued), Heather R. Cash, Louisville, KY, for appellees.

Before ACREE, MOORE and NICKELL, Judges.

## OPINION

MOORE, Judge:

Janet and Ronald Jones appeal a defense verdict in their medical negligence action against Stephen K. Overstreet, M.D., Stephen K. Overstreet, M.D., PLLC, and Humana Insurance Company (collectively "appellees"). The sole issue on appeal is whether the trial court committed reversible error in admitting a wire into evidence on the basis that the wire qualified as a true replica of the instrument that allegedly caused the injuries at issue in the appellants' action. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Dr. Overstreet performed an esophageal dilation procedure at Baptist Hospital Northeast on Janet's esophagus for what Dr. Overstreet suspected was a mid-esophageal stricture. The appellants describe the specifics of this procedure in their brief:

After [a] diagnostic, upper endoscopy [is performed], a guide wire is placed through the endoscope (which has an open channel) past the area of the suspected stricture in the esophagus and into the stomach. After the wire is properly positioned under direct visualization, the endoscope is slowly removed while the wire is simultaneously advanced in order to maintain the position of the wire in the stomach. After the endoscope is removed, the position of the wire is confirmed by using distance markings placed on the wire by the manufacturer or by using fluoroscopy (x-ray). The wire is held in position at the patient's incisors by an assistant, and the dilator is then loaded onto the back of the wire and lubricated. The physician must then firmly secure the wire outside the patient and advance (push) the dilator over the guide wire past the suspected stricture. If subsequent, larger dilators are used, the initial dilator is removed, and the wire is held in place at the incisors by an assistant. The placement of the wire is re-checked by using the wire markings or fluoroscopy, and the process is repeated. When the dilations are completed, the wire and dilator are removed together.

. . . .

[A] Savary–Gilliard wire is utilized as a safety device to guide the passage of the dilators. It is manufactured and designed with a flexible, floppy [spring] tip. The tip is at the front end of the wire and is inserted into the patient. When used properly, the flexible, floppy [spring] tip is also intended and designed as a safety device. The flexible, floppy [spring] tip is wider in diameter than the remainder of the wire and the dilator so the dilator cannot be pushed beyond the wire. The flexible, floppy [spring] tip is soldered to the rest of the wire, and if there is excessive movement or bending of the wire at this junction, a sharp edge can be created or the tip

may even break off completely. The wire can be of different lengths, but it is typically 160 centimeters long. It has markings (bands) in 20 centimeter increments indicating the distance from the floppy [spring] tip (front end) of the wire in relationship to a fixed point on the patient—the incisors. In most patients, the wire is inserted to the band with three marks or approximately 60 centimeters from the tip of the wire to the patient's incisors. The wire is manufactured and designed to be a reusable medical device.

Immediately following Janet's procedure, Dr. Overstreet consulted with a general surgeon, Dr. Thomas Hart, because Janet was complaining of abdominal pain. Dr. Hart's consult note states that Dr. Overstreet felt moderate resistance upon passage of the second dilator during the procedure and that Dr. Overstreet had noticed that the initial guide wire was "somewhat kinked" when he removed it from Janet's esophagus. Janet was transferred to Baptist Hospital East for further evaluation and treatment. She was seen by Dr. Marc Marcum, a general surgeon. Dr. Marcum suspected that the guide wire that Dr. Overstreet had used in Janet's procedure had caused a stomach or duodenal perforation. During surgery, Dr. Marcum found evidence of a perforation.

The appellants filed a medical negligence suit in Jefferson Circuit Court against Dr. Overstreet and his practice, and the case proceeded to trial. Both of the appellants' experts, Drs. Alvin Zfass and Patrick Okolo, testified that Dr. Overstreet's method of marking, securing, and controlling the guide wire during Janet's procedure fell below accepted standards of care and had caused the guide wire to move beyond the stomach, bend into a sharp edge at the front end, and perforate Janet's duodenum.

The appellees argued that Dr. Overstreet had met the applicable standard of care when he performed Janet's procedure. The appellees' experts, Dr. William Emlich, Jr., Dr. Kashif Haider, and Dr. Overstreet himself testified that (1) a perforation is a known risk of the dilation procedure and could occur even when the physician does not breach the applicable standard of care; (2) there was no evidence that the guide wire even reached Janet's duodenum; and (3) the perforation may have been caused by something unrelated to the procedure, i.e., a duodenal ulcer.

At trial, Dr. Overstreet testified that he had performed Janet's esophageal dilation procedure with a Savary–Gilliard guide wire and polyvinyl dilators. However, the original guide wire that Dr. Overstreet had used during Janet's procedure was unavailable for trial; Dr. Overstreet testified that, to his knowledge, Baptist Hospital Northeast had disposed of it. As such, both parties equally utilized sample Savary–Gilliard guide wires to prove their respective theories of this case. In particular, both parties had virtually every expert use sample guide wires to perform simulations of Janet's procedure for the jury, and the sample guide wires were manipulated and bent during those simulations. Aside from those demonstrations, Dr. Zfass, the appellants' expert, also allowed a juror to touch part of a sample guide wire. At one point in his demonstration, Dr. Zfass held a sample guide wire in his mouth. And, both Drs. Emlich and Haider demonstrated the flexibility of the spring tip at the front end of a sample guide wire by probing it into their hands. Dr. Haider remarked that the spring tip "couldn't even pop a balloon."

Near the end of Dr. Haider's testimony, the appellees' counsel asked Dr. Haider whether the sample guide wire that he had

been demonstrating with was representative of the type of guide wire that Dr. Overstreet would have used in Janet's procedure. Dr. Haider stated, "I would think so. I mean, this is the guide wire that we use. Yes, sir." Thereafter, the appellees sought to introduce the sample guide wire into evidence. The appellants objected.

The matter of whether the sample guide wire was admissible as evidence was postponed. The parties argued this issue before the trial court on the following day.

Appellees' Counsel: Your honor, we, we did check the tapes, or CD's last night. We did find the area where Dr. Overstreet acknowledged that this particular wire is indeed of the same type that was utilized and we've got that marked for the court so that we can mark the wire as an exhibit. Um, and above and beyond that, I will tell the court if the plaintiff has rested, that it is the intention of the defense to rest as well.

The Court: Alright.

Appellants' Counsel: Let me address the wire issue, your honor. Um, with respect to the wire issue, um, the wire that we have here that Mr. Whonsetler is seeking to introduce into evidence is not the wire that was used in Mrs. Jones' case. It is not evidence in that way, shape, or form. At the very best, that wire and any of the other wires that have been used in this courtroom are visual aids that have been used by the witnesses to explain their testimony. Um, to the extent that someone, in this case perhaps Dr. Overstreet says it is the same wire or an exemplar similar wire, it is still only sufficient to establish it as a visual aid. Our objection to this going to the jury is several-fold. First,

the wire is not necessarily in the same condition as the wire that he used, so there is a substantial danger of prejudice or confusion. I don't know if that's a new wire that just came out of the box. I don't know if it is a wire that has been used on repeated occasions. So that is a problem. In addition to that, the problem we have here is we're going to take a visual aid into the jury room for purposes of allowing the jury to conduct demonstrations or experiments with the wire, which means that we are making decisions in this case potentially based on things that are not in evidence. The physicians in this case can use the visual aids or the wire to explain their testimony. It's been bent, handled, moved, manipulated, or any other way, shape or form. But there is not any authority that I am aware of that says a visual aid goes to the jury as some form of evidence. And, to the extent it has any relevance whatsoever, there is a much more high likelihood of danger of confusion and prejudice such that the court should exclude it under Rule 403.[1] And for those reasons we do object to the wire being put into evidence for the jury to manipulate and handle.

Appellees' Counsel: Only briefly, your honor.

The Court: Yes.

Appellees' Counsel: I don't think anyone has said that this is the same wire. In fact, Dr. Overstreet indicated that the wire was no longer available, it was turned over to the tech at the hospital and presumably destroyed. I don't think "destroyed" is the word he used, but presumably "thrown out," I think is the word that he used. That's number

---

1. Kentucky Rule(s) of Evidence (KRE) 403 provides that "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

one. Number two is, this wire has been in the hands of literally every expert witness that has been put up in front of the jury. The jury was even so interested in knowing about the characteristics of the wire that the court asked that a demonstration be done in front of the jury. And two of the jurors, or one of them—I think only one—came up to the court bench inquiring about the wire itself. To the extent that we are talking about a wire that has a safety device on the tip of it, we are not representing that this wire is of a, of the exact circumstance as the wire that Dr. Overstreet had. It's the same type of wire. But, we have no idea as to what went wrong, if there was anything that went wrong, with the wire that he employed. And so, I think it is pertinent for the jury to have in their hands the wire, since the very comments that we have made to this jury having to do with the allegations of negligence against Dr. Overstreet have to do with how he handles the wire. They have seen that, both from Dr. Overstreet and Dr. Haider as to how he handles the wire, and I think it's entirely appropriate, particularly since plaintiffs' attorney is saying, "this is the wire, this, this is the instrument that caused the injury," for them to be able to have the wire and come to a conclusion as to whether Dr. Overstreet utilized it appropriately.

. . . .

The Court: I think it is clear from every witness who took the stand and who understood these things that were handed this wire, not one of them said, "This probably isn't like what was used." Every one of them said that it is. So I think in terms of similarity, we've covered that. Um, my greater concern is with what a jury does with it. In other words, I'm not sure there's anything more that they can glean from this wire

that hasn't already been stated by the physicians. My worry is what they will do with it back in the jury room, what kind of conclusions will they draw that may or may not have any relevance to the issues at hand. Um, and that's a concern of the court. Um, on the other hand, we're trusting them to make some pretty important decisions, digest a lot of medical testimony, they were shown this wire and it's been discussed for hours, I suspect if we added up all the time.

After further considering the parties' arguments, the trial court granted the appellees' motion to enter the sample guide wire into evidence.

The Court: The closest thing we have in Kentucky is *Hogan v. Cooke Pontiac* [*Co.*, 346 S.W.2d 529 (Ky.1961) ], where they brought in a model of a master brake cylinder and the judge let it in. The appellate court felt that it was appropriate and actually encouraged that sort of thing to come in. Um, and at this point in time I'm going to allow the wire to come in and be introduced. I think the jury has seen it quite a bit, um, and I think I have some concerns about what they'll do with it, but, um, I think it's been utilized so much that I can't overrule their request to put it in and sustain your objection to it coming in. So the guide wire will come in as Defendants' Number 20.

The appellants requested that the trial court make it clear for the jury "that this is not the wire, or may not be the same, in that, in that fashion. That it is used only for illustrative purposes." The appellants also requested that the trial court "admonish the jury not to do demonstrations with the wire in the jury room." In response, the trial court stated:

Um, I will ask them not to try to bend it and such for the simple reason that I don't want it, some day, some appellate court may be looking at it, and I don't want them saying "look at this, they sent a bent wire back to the jury." So I'm going to be asking them not to be bending it or anything like that. They can hold it, they can look at it, but I don't want them bending it for fear that somebody thinks that we sent a bent wire back there. Um, so yes, I'll say that as well.

Thereafter, the appellees gave their closing argument. In relevant part, the appellees stated:

Dr. Zfass specifically admitted [a perforation] cannot happen unless the wire is defective. It can't happen unless it's defective. Well, you know you've got a nurse at the hospital,[2] she's not going to be suing her employer. And so what happened? This jury heard, well, Dr. Overstreet, he should have inspected this wire better. It's his duty to inspect this wire. And then he had to admit, well now wait a minute, it can look perfectly normal and be acceptable. Many of you may recall I personally bent the wire well over, and it stayed there. And then I bent it back. And Dr. Zfass said, "I have to admit, that tip as I see it now would be acceptable for me to use. And I had to ask did anybody ask Dr. Overstreet how many people had their hands on this wire at the hospital to check before it ever gets in his hands to determine by visualization? I mean, we talked earlier in this case about electron microscopy, but at least by feel and by visualization whether or not the wire's appropriate to put down. The point of Dr. Zfass's testimony is, it may look perfectly normal and be ready to be used, and yet not be normal. Now, I'm not making up that testimony. That's from the plaintiff's own expert. It can't happen unless the wire is defective.

. . . .

Five layers of tissue. We heard that the duodenum is so thin that this can go right through it. Then we heard from Dr. Emlich yesterday and he said, "What? The duodenum is the same thickness, it has five layers, as the stomach." The stomach is just slightly more muscular, but it's got five layers of tissue. It's got to go through five layers? You've got to be kidding me. And you all saw Dr. Emlich going like this.

At this point in the appellees' closing argument, the appellees' counsel probed the spring tip of the front end of the guide wire into the back of his hand. Then, without any objection from the appellants, he repeatedly probed it into the inside of his mouth.

Appellees' Counsel: I cannot. Try as I may. Try as I may, I can't even get that through the mucosa of the inside of my mouth. Is it any wonder why Dr. Overstreet has said, I know I'm going to put fourteen people out, but I by golly want my day in court because I was trained the right way, I handled this the right way, and I don't think it was the wire that did this. But if it did, based on Dr. Zfass's own testimony, it had to have been defective.

Following the appellees' closing argument, the trial court gave the following statement to the jury:

Ladies and gentlemen, I need to bring you up to speed on one item that I neglected to do before Mr. Whonstetler did his closing, although frankly he did something in it that's going to kind of facilitate my explaining things to you.

2. At the time of this incident, Janet was employed as a nurse at Baptist Hospital.

Before we finished with the case in terms of putting proof in, while you all were outside just before lunch, I allowed into evidence the guide wire, or an exemplar of the guide wire from this case. You've heard the witnesses talk about this, you've seen them use it, it's now in evidence. It will go back with you to the jury room. My reluctance in allowing that in was because it's not back there for you all to experiment with. You've heard me talk about how each time I send you home, you're not to experiment on your own or try to gather—this is not for you all, with all due respect to Mr. Whonstetler, to sit there and see if you can push it through your lip or any other thing. I don't want anybody getting hurt playing with it or concluding something because you couldn't do something. Don't try to make it break or anything like that. So, it's in evidence, but it's not there for you all to experiment with.

The appellants did not ask the trial court to admonish the jury any further. And, immediately following the trial court's admonition, the appellants gave their own closing arguments which lasted approximately one hour. During their closing arguments, the appellants' counsel also used the sample guide wire in front of the jury. In particular, the appellants' counsel bent the spring tip on the front end of the wire, stating:

The defendant has admitted that he pushed the thing to the spring tip. And again, the problem with this is you end up passing an unnecessary amount of dilator for performing the procedure correctly. And by banging into this tip over and over again with the dilator, you increase the likelihood you're pushing against this and bending it. That's one thing we know he did wrong.

At the conclusion of the appellants' closing arguments, the jury deliberated. The sample guide wire was made available to the jury during its deliberations. The jury eventually returned a verdict in favor of appellees, and this appeal followed.

## ANALYSIS

As noted, the sole issue raised in this appeal is whether the trial court committed reversible error when it allowed the appellees to introduce the sample guide wire into evidence. The appellants first argue that the only wire that should have been entered into evidence was the actual wire that Dr. Overstreet used to perform Janet's esophageal dilation procedure, and that objects used as visual aids are never admissible as evidence and should never be submitted to a jury. We disagree.

■ Generally speaking, "Visual aids are a part of the witness' testimony but they are not a substitute for testimony, nor are they admitted as exhibits." *Hellstrom v. Commonwealth*, 825 S.W.2d 612, 616 (Ky.1992); *see also Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky.1997). However, the appellants' argument is legally incorrect if the object or visual aid in question qualifies as a "true replica" under Kentucky precedent. *See, e.g., Cincinnati, N.O. & T.P. Ry. Co. v. Duvall*, 263 Ky. 387, 92 S.W.2d 363, 366 (1936) (holding that such a model or object *"may be submitted to the jury* to aid them in understanding how an event occurred or might have been prevented.") (citing 22 C.J. 768, § 869) (emphasis added); *Hogan v. Cooke Pontiac Co.*, 346 S.W.2d 529, 532 (Ky.1961) (holding that "true replica[s]" are allowed into evidence when they are a "useful aid to the jury in understanding the evidence and in obtaining a clear comprehension of the physical facts"); *Mitchell v. Commonwealth*, 2005 WL 2316195 (Ky.2005) (2003–

SC–000670), at \*4, note 5 [3] (explaining that a visual aid qualifying as a "true replica" may be formally admitted into evidence); *see also Gorman v. Hunt,* 19 S.W.3d 662, 669, n. 33 (Ky.2000) ("the prevailing practice in trial courts in civil cases is not only to permit, but, without a request from the jury, to send exhibits back to the jury room when the jury begins its deliberations.").

The appellants also pose three alternative arguments: [4] 1) even if an object used as a visual aid could be admitted into evidence, the sample guide wire that was introduced into evidence in this matter could not have qualified as admissible evidence because it was impossible to determine whether the sample guide wire was in exactly the same condition as the guide wire that allegedly inflicted Janet's injuries; [5] 2) the trial court failed to properly admonish the jury regarding the sample guide wire, per KRE 105; and 3) the trial court should have excluded the guide wire from evidence, per KRE 403, because its probative value was substantially outweighed by the danger of creating undue prejudice, confusing the issues, or misleading the jury.

We disagree. However, before addressing these alternative arguments, we must first discuss what a "true replica" is under Kentucky precedent, and why the guide wire qualified as a "true replica."

In Kentucky, models or objects are "true replicas," and admissible evidence for the jury to consider where they are properly identified and authenticated as evidence of the things which they represent and where the items they represent are relevant. *Duvall,* 92 S.W.2d at 366. "Any evidence to the contrary goes to weight, not admissibility" of the evidence. *Allen v. Commonwealth,* 901 S.W.2d 881, 885 (Ky.App.1995). And, like any other evidence, "It is within the sound discretion of the trial judge to determine whether the probative value of [the true replica] evidence is outweighed by its possible prejudicial effect and to admit or exclude it accordingly." *See Beard v. Commonwealth,* 2006 WL 1360887 (Ky.2006) (2004–SC–000548–MR), at \*4 [6] (citing *King v. Grecco,* 111 S.W.3d 877, 885 (Ky.App.2002), and *Rake v. Commonwealth,* 450 S.W.2d 527 (Ky.1970)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

*Hogan, Allen,* and *Beard* illustrate the application of these principles. In *Hogan,*

---

**3.** We find *Mitchell* to be persuasive authority in this case and proper to cite because it fulfills the criteria of Kentucky Rule(s) of Civil Procedure (CR) 76.28(4).

**4.** In their brief, the appellants also argue that "the trial judge clearly abused his discretion by failing to consider other evidentiary alternatives such as passing the wire to the jury during trial under the Court's supervision or allowing the jurors to return to the courtroom to view the wire if they needed to see it again and by failing to state on the record the reasons for admissibility."

At trial, however, the appellants failed to raise or preserve any issue regarding "evidentiary alternatives" for our review.

Moreover, the trial court unequivocally allowed the guide wire into evidence as a "true replica," citing to *Hogan,* 346 S.W.2d at 532. It is evident, from reviewing the trial court's ruling, that the trial court believed that the probative value of the sample guide wire outweighed its potential for prejudice.

**5.** As noted, the sample guide wire was presumably new, while the guide wire used in Janet's procedure had been disposed of and its condition was unknown.

**6.** We find *Beard* to be persuasive authority in this case and proper to cite as it fulfills the criteria of CR 76.28(4).

the right front wheel assembly in the plaintiffs' 1956 Pontiac car, which positioned the brake shoes on the right front wheel, allegedly malfunctioned and caused an accident. The question presented was whether the assembly had allowed the brake shoe in the right front wheel to become improperly positioned. *Hogan*, 346 S.W.2d at 531. The defendants sought to introduce into evidence a new right front wheel assembly from the same model of car to demonstrate that it could not have malfunctioned in the manner alleged by the plaintiffs. The former Court of Appeals held that the evidence, which included the testimony of the defendants' experts, sufficiently established that the new right front wheel assembly was an admissible true replica of a right front wheel assembly in the plaintiffs' 1956 Pontiac car. *Id.* at 532. The *Hogan* Court made this ruling in spite of other evidence raising "a possibility that *something* was wrong with the brake" on the wheel of the plaintiffs' car, and the plaintiffs' assertion that the defendant had "put itself in a position where it could conceal or secretly correct any defects in the brake system" subsequent to the accident in question. *Id.*

The defendant in *Allen*, 901 S.W.2d 881, had allegedly used a paddle to abuse children. The witnesses who were specifically asked about the thickness of the paddle testified that it was actually thicker and less flexible than a model paddle that the Commonwealth sought to introduce as a "true replica." *Id.* at 884–5. However,

the *Allen* Court found no error in the trial court's decision to admit a model paddle into evidence as a "true replica" because those witnesses also testified that the model paddle was comparable in color, length, and width. *Id.*

And, the defendant in the more recent case of *Beard*, 2006 WL 1360887, was accused of using a wooden carved phallus to sexually abuse a child. The Commonwealth sought to enter a wooden phallus found in the defendant's home into evidence as a "true replica" of the phallus the defendant allegedly used. *Id.* at *4. The child in question identified the wooden phallus that the Commonwealth sought to introduce "as being the same type as the one used on her, except the one used on her was smaller." *Id.* In its review, the Supreme Court of Kentucky found no error in the trial court's decision to admit it into evidence as a "true replica" because, in spite of its differences, "the evidence was exactly as [the child] had described, wooden carvings of a 'boy's private part.'" *Id.* at *5.

In sum, Kentucky's definition and treatment of a "true replica" essentially mirrors the explanation of admissible models and replicas provided in 29A Am.Jur.2d. *Evidence* § 1006 (2011),[7] which states in relevant part:

> Models and objects offered in evidence for purely illustrative purposes must not only be relevant and material in character to the ultimate fact sought to be demonstrated by their use, but, additionally, must be supported by proof show-

---

7. In its analysis of what qualifies as a "true replica,": the *Hogan* Court actually relied upon a predecessor of this section of American Jurisprudence, 20 Am.Jur. *Evidence* § 740. *See Hogan*, 346 S.W.2d at 532. As it appeared at the time of *Hogan*, 20 Am.Jur. *Evidence* § 740 stated:

> Models and casts that correctly represent the object concerning which relevant testi-

mony is given, and which may assist the jury in understanding the evidence, are frequently received in evidence. The admission of such models and casts rests largely in the discretion of the trial court. A cast, if otherwise relevant and admissible, may be received in evidence even though it may be of a gruesome character.

ing such evidence to be substantially like the real thing and substantially similar in operation and function to the object or contrivance in issue. A model or replica should be excluded where the jury is apt to be misled by it or by its use. However, the fact that a model differs in some respects from the original will not prevent its admission in evidence or its use for purposes of demonstration or illustration, where such dissimilarity is clearly explained to the jury, or where the difference is not such as to mislead the jury.

(Internal citations omitted).

■ The sample guide wire that the trial court admitted into evidence in the case at bar satisfied the two criteria for qualifying as a true replica, *i.e.*, it was "relevant and material in character to the ultimate fact sought to be demonstrated by its use" and "supported by proof showing such evidence to be substantially like the real thing and substantially similar in operation and function" to the guide wire. *Id.* It was relevant because, as the appellants themselves note in their brief, "The guide wire was alleged by the Appellants to have been the instrument which caused the injury," and "during the testimony of each and every expert at trial, and during Dr. Overstreet's testimony, sample guide wires were used to assist the jury in understanding the procedure, the manner in which the guide wire is marked, secured, and controlled, and how the wire could kink or bend causing a sharp edge and perforation."

■ Moreover, the sample guide wire was adequately identified and authenticated as evidence of what it purported to represent. Dr. Overstreet testified that he performed Janet's esophageal dilation with a Savary–Gilliard guide wire. He represented, through counsel, that the sample guide wire he sought to introduce in evi-

dence was representative of that type of wire. After demonstrating the esophageal dilation procedure for the jury with the guide wire that was eventually introduced into evidence, Dr. Haider also testified that it was representative of the guide wires he used in his own practice for that procedure. And, the sample guide wire entered into evidence matches the appellants' description of a Savary–Gilliard guide wire, *i.e.*, one end of the wire has a flexible spring tip that is wider in diameter than the remainder of the wire, and it has markings in 20–centimeter increments indicating the distance from the spring tip. Indeed, the appellants offer no contention that the sample guide wire entered into evidence is not representative of a typical Savary–Gilliard guide wire.

■ Bearing this in mind, we return to the first of the three alternative arguments posed by the appellants. The appellants argue that the sample guide wire should have been excluded from evidence because it might have been a new Savary–Gilliard wire; the guide wire that Dr. Overstreet used during Janet's procedure might have been a used wire that was more prone to breaking; and, Dr. Hart's consult report indicated that the wire that Dr. Overstreet had used during Janet's procedure might have been "somewhat kinked" afterward, and the sample wire was not "somewhat kinked."

The guide wire, however, fit the criteria for qualifying as a true replica. These differences between the condition of the sample guide wire and what the appellants speculated was the condition of the actual guide wire were a matter of weight, not admissibility. *Allen*, 901 S.W.2d at 885.

Moreover, we reemphasize that "the fact that a model differs in some respects from the original will not prevent its admission in evidence or its use for purposes of dem-

onstration or illustration, where such dissimilarity is clearly explained to the jury, or where the difference is not such as to mislead the jury." 29A Am.Jur.2d. *Evidence* § 1006 (2011). Here, the appellants cannot demonstrate that the sample wire posed a substantial danger of misleading the jury. Dr. Overstreet introduced the sample guide wire into evidence to illustrate the appearance of the type of guide wire he used during Janet's procedure. He did not represent that it was the *actual* guide wire that he used or that it was even in the same condition as the actual guide wire. He testified that, to his knowledge, the hospital had disposed of the guide wire that had allegedly caused Janet's injuries. The appellants also described for the jury, throughout the course of the week-long trial in this matter, that the original wire may have appeared "somewhat kinked" and that it was unknown whether the actual wire was new or used. And, using several expert witnesses, the same sample guide wire, and other sample guide wires, the appellants also demonstrated and described at length how the actual guide wire could have caused Janet's injuries. In sum, we find the first of the appellants' three alternative arguments to be without merit.

Next, we turn to the appellants' second alternative argument, *i.e.,* that the trial court failed to admonish the jury, per the requirements of KRE 105(a), with regard to the sample guide wire. In particular, the appellants claim that the trial court's admonition confused the jury, failed to instruct the jury not to experiment with the guide wire, and incorrectly represented that the substitute guide wire was the actual guide wire.

In relevant part, KRE 105(a) provides that "When evidence which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly."

■ That said, the appellants' argument simply asks this Court to assume that the jury was confused by the trial court's admonition, but it offers nothing to support that conclusion. We believe that the trial court's admonition, taken as a whole, was adequate. Contrary to what the appellants represent, the trial court's admonition stated, *twice,* that the sample guide wire was "not back there for you all to experiment with." And, contrary to what the appellants represent, the trial court's admonition did not state that the sample guide wire was the actual guide wire. Rather, the trial court referred to it as "an exemplar of the guide wire from this case." Moreover, this latter point should have already been apparent to the jury at the time of the admonition because Dr. Overstreet had already testified that the actual guide wire had, presumably, been discarded by the hospital following Janet's procedure.

More to the point, nothing prevented the appellants from requesting an additional admonition from the trial court to address their concerns or for further clarification. *See, e.g., Curtis v. Commonwealth,* 474 S.W.2d 394, 397 (Ky.1971) ("It was incumbent on [the defendant], if he felt that the admonition was inadequate, to move the trial court for a further admonition or to move for a mistrial.") (citing *Reeves v. Commonwealth,* 462 S.W.2d 926 (Ky. 1971)). Nothing prevented the appellants from reemphasizing, during their hour of closing arguments immediately following the trial court's admonition, that the sample guide wire was not the actual guide wire and that the jury should not experiment with the sample guide wire. The appellants actually used the sample guide

wire as a visual aid during their closing arguments. Indeed, the first time that the appellants voiced any concern regarding the trial court's admonition was in their appeal before this Court. In short, the appellants' second alternative argument cites nothing indicative of error or prejudice, and it is therefore without merit.

■ The appellants' final alternative argument is that the trial court should have excluded the sample guide wire, per KRE 403. Specifically, the appellants contend that even if the trial court had properly instructed the jury not to experiment with the sample guide wire and even if the jury understood that instruction, admitting the sample guide wire into evidence was prejudicial error because its presence created an irresistible opportunity for the jury to conduct unsupervised experiments with the sample guide wire. Thus, this would allow the jury to acquire information that was not presented at trial. The appellants also argue that, as evidence, the sample guide wire was "needlessly cumulative."

Like the appellants' previous argument, this argument also calls upon us to make assumptions: first, that the jury chose to ignore the court's direction not to experiment with the sample guide wire; and second, that after experimenting with the sample guide wire, the jury deduced something about the sample guide wire that had not been revealed at trial. We decline to make these assumptions.

■ As stated in *Greene v. Commonwealth*, 244 S.W.3d 128, 138 (Ky.App. 2008):

[A] jury is presumed to follow an admonition to disregard evidence; thus, the admonition cures any error. *Mills v. Commonwealth*, 996 S.W.2d 473, 485 (Ky.1999). There are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition and there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant; or (2) when the question was asked without a factual basis and was "inflammatory" or "highly prejudicial." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky.2003).

Because this matter regards prejudice relating to the introduction of an object into evidence, rather than the asking of a question, the latter of these exceptions is not applicable.

As to the former exception, even if this Court were to classify the sample guide wire or the jury's hypothetical experimentation with the sample guide wire as "inadmissible evidence," and further assume that there was "an overwhelming probability that the jury [was] unable to follow the court's admonition," the appellants cannot show that there was "a strong likelihood that the effect of the inadmissible evidence [was] devastating" to their case. *Id.* The trial court did not give the jury the sample guide wire until after the week-long trial had concluded and the jury was ready to deliberate. The appellants acknowledge in their brief that "the jury had already repeatedly seen wires during the testimony of the physician witnesses," and "everyone in the courtroom except the jury had already handled a guide wire." As noted, most of the experts called in this matter bent, manipulated, demonstrated with, and testified extensively about the samples of the guide wire that Dr. Overstreet used in Janet's procedure. Aside from that, Dr. Emlich, one of the appellees' experts, demonstrated the integrity of the spring tip of the sample guide wire by probing it against the back of his hand. During his testimony, Dr. Zfass, one of the appellants' experts, even allowed a juror to touch part of a sample guide wire and held part of a

sample guide wire in his mouth. And, when the appellees' counsel proceeded to probe the back of his own hand and the inside of his own mouth with the spring tip of the sample guide wire during closing arguments, the appellants raised no objection.

In short, before the jury had the sample guide wire for its deliberations, virtually everything that could have been done to the sample guide wire had already been done to it, along with other sample guide wires, during the trial. There is no reason to believe that admitting the sample guide wire into evidence was "devastating" to the appellants' case. Indeed, the trial court recognized that admitting the wire into evidence posed little danger of prejudicing the appellants' case when it stated, "I'm not sure there's anything more that [the jury] can glean from the wire that hasn't already been stated by the physicians."

▇▇ For the same reasons, even if the sample guide wire was the "needlessly cumulative" evidence that the appellants allege, any error that resulted from admitting it into evidence was harmless. *See* CR 61.01; *see also Mitchell,* 2005 WL 2316195 at *5 ("We do not believe that the use of the [replica] gun prejudiced the jury in a substantial manner in light of the totality of the evidence[.]").

## CONCLUSION

For these reasons, the judgment of the Jefferson Circuit Court is affirmed.

ALL CONCUR.