RENDERED: DECEMBER 13, 2018
TO BE PUBLISHED

## Supreme Court of Kentucky

FINAL

2017-SC-000440-DG    DATE 1/3/19 Kim Redmon, DC

JEWISH HOSPITAL & ST. MARY'S                                    APPELLANT
HEALTHCARE, INC. D/B/A JEWISH
HOSPITAL MEDICAL CENTER SOUTH


                          ON REVIEW FROM COURT OF APPEALS
V.              CASE NOS. 2015-CA-001205 AND 2015-CA-001278
                    BULLITT CIRCUIT COURT NO. 12-CI-01132


BARBARA HOUSE, ADMINISTRATRIX OF                               APPELLEES
THE ESTATE OF LAURA B. ALEXANDER,
DECEASED; BARBARA HOUSE, CO-
GUARDIAN OF KAYLEN ALEXANDER, A
MINOR; AND DARRELL HOUSE, CO-
GUARDIAN OF KAYLEN ALEXANDER, A
MINOR


                **OPINION OF THE COURT BY JUSTICE KELLER**

                    **REVERSING AND REINSTATING**

Laura Alexander was a patient at Jewish Hospital Medical Center South

("Jewish Hospital"). She was treated and released on November 28, 2011.

Tragically, later that evening, Laura was taken by ambulance to Jewish

Hospital in downtown Louisville. She died several hours later from cardiac

arrest secondary to a staph aureus infection in her blood. Barbara House,

Laura's mother and administratrix of her estate, brought suit in Bullitt Circuit

Court, alleging medical malpractice against Dr. Charles Sherrard, Jr., Jewish

Hospital, and Dr. Sherrard's professional group. Dr. Sherrard settled the

claims against him but the case against Jewish Hospital proceeded to trial, after which a jury found in favor of Jewish Hospital. The Court of Appeals reversed and remanded for a new trial. This Court granted discretionary review. For the following reasons, we now reverse and reinstate the judgment of the Bullitt Circuit Court.

## I. BACKGROUND

Laura, then thirty-three years old, came into Jewish Hospital's Emergency Room ("ER") early on the morning of November 28, 2011. She complained of dark urine, feeling dehydrated, muscular pain, and weakness in her arms and legs. Although her blood pressure was in the normal range, her heartrate was elevated at 148 beats per minute (bpm). Dr. Sherrard evaluated Laura at approximately 6:15 a.m.; he obtained a medical history, ordered lab tests, and ordered two liters of intravenous fluids to be administered.

Early during Laura's stay, the nursing shift changed, and Nurse Charity Johnston began assisting in Laura's treatment. Johnston administered the first liter of fluids at 6:30 a.m.; at 8:08 a.m., Dr. Sherrard re-evaluated Laura and noted that her heartrate had decreased to between 114 and 118 bpm. During this re-evaluation, Laura informed Dr. Sherrard that she had exercised strenuously a few days earlier. Due to this new information, Dr. Sherrard suspected that Laura's symptoms were caused by rhabdomyolysis, muscle fibers breaking down after physical damage. Laura's potassium was decreased in her lab results so Dr. Sherrard also diagnosed Laura with hypokalemia, a

2

potassium deficiency, as well as acute dehydration, exercised-induced myositis (inflammation of muscle tissue), and myofascial (muscular irritation) pain.

At 8:15 a.m., Dr. Sherrard entered an order discharging Laura, conditioned upon her receiving a second liter of fluids. Johnston administered the second liter at 8:18 a.m. At that time, Laura's heartrate was 124 bpm. At 9:47 a.m., Johnston discharged Laura. At that time her heartrate was 132 bpm. Although her heartrate was lower than when she first presented in the ER, it was higher than when Dr. Sherrard had last evaluated Laura. Johnston did not notify Dr. Sherrard of this change but, instead, continued with the discharge instruction. Johnston stated that she felt, in her nursing judgment, that Laura's heartrate at discharge was consistent with what it had been at the time Dr. Sherrard had ordered the conditional discharge.

Laura's discharge from Jewish Hospital, while still tachycardic, was the focal point of the alleged malpractice of both Dr. Sherrard and Nurse Johnston. During his deposition testimony, Dr. Sherrard explained that there were several factors he felt contributed to Laura's increased heartrate: she had just finished taking Flexeril (prescribed for muscular pain) which can cause tachycardia; tachycardia can occur with dehydration and may not completely resolve with fluids; and Laura's heartrate at a recent visit to the ER was also above 100, so her baseline may be higher than normal.

Laura went home with her mother and spent most of the day in bed. At about 7:00 p.m. that same evening, Laura experienced sudden shortness of breath and paralysis in her arms and legs. She was taken by ambulance to

3

Jewish Hospital's downtown Louisville facility. After a thorough examination and aggressive care, doctors determined that Laura was in septic shock. When Laura visited the emergency room earlier that day, she had not presented with fever, chills, or any of the normal signs of infection, per Dr. Sherrard. Upon admission that evening, the doctors and nurses at the downtown facility administered antibiotics upon determining she was in septic shock. Sadly, the professionals were unable to save Laura. She passed away shortly after midnight from cardiac arrest, secondary to a staph aureus infection in her blood. It was later determined that Laura had been treated several weeks prior for a boil;[1] it had been surgically lanced and was the probable cause of the sepsis that led to Laura's death.

Dr. Sherrard settled Laura's estate's claims against him. The claims against Jewish Hospital proceeded to trial. Dr. Sherrard was not present at trial; his video deposition was played for the jury. He was still included as a party to the proceedings for apportionment purposes under Kentucky Revised Statute ("KRS") 411.182.[2] At the close of plaintiff's case, Jewish Hospital's counsel moved for directed verdict, claiming that the plaintiffs had failed to prove causation. The trial court denied the motion. Jewish Hospital then

---

[1] This fact was unknown to Dr. Sherrard or Jewish Hospital personnel when Laura came into the ER that morning.

[2] "In all tort actions ... involving fault of more than one (1) party ... including third-party defendants and persons who have been released ... the court ... shall instruct the jury to answer interrogatories ... indicating: (a) The amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and (b) The percentage of the total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability ..." KRS 411.182(1).

moved for directed verdict on standard of care as to Dr. Sherrard; counsel argued that it was undisputed by the parties that Dr. Sherrard's conduct fell below the standard of care. Laura's estate's counsel argued that, from Dr. Sherrard's video testimony, he testified that his conduct was appropriate. Because Dr. Sherrard was an expert witness, this testimony was sufficient to create an issue of fact for the jury. The judge granted Jewish Hospital's motion, stating that each of the expert witnesses presented by Laura's estate had testified that Dr. Sherrard's conduct was below the standard of care. The case was presented to the jury with an instruction that Dr. Sherrard had fallen below the standard of care. The jury returned a verdict for Jewish Hospital.

The Estate appealed. The Court of Appeals determined that, not only was the trial court's grant of directed verdict in error, but also held that a trial court *cannot* grant a directed verdict of negligence against an empty-chair defendant. The Court of Appeals cited to this Court's case in *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64 (Ky. 2010) as the foundation of its broad holding. The Court of Appeals reversed the judgment and remanded the case for a new trial. Jewish Hospital moved this Court for discretionary review, which we granted.

## II. STANDARD OF REVIEW

On appeal, the central issue before this Court is whether the trial court erred in granting a directed verdict on the issue of Dr. Sherrard's failing to meet the relevant standard of care. "[A] trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ."

5

*Argotte v. Harrington*, 521 S.W.3d 550, 554 (Ky. 2017) (quoting *Bierman v. Klapheke*, 967 S.W.2d 16, 18-19 (Ky. 1998)). "The trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion." *Argotte*, 521 S.W.3d at 554 (quoting *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983)). "On appellate review of an order granting a directed verdict, the test is whether 'under the evidence as a whole it would not be clearly unreasonable for a jury to find [for the plaintiff].'" *Argotte*, 521 S.W.3d at 554 (quoting *Sawhill*, 660 S.W.2d at 5).

## III. ANALYSIS

### A. MAY A TRIAL COURT ENTER DIRECTED VERDICT AGAINST AN EMPTY-CHAIR DEFENDANT?

On direct appeal, the Court of Appeals discussed the oddity of a plaintiff's case involving an empty-chair defendant. "The plaintiff's strategy in such cases is turned on its head." The plaintiff no longer hopes to prove this absent actor at fault, but rather to minimize that party's comparative fault and, thus, maximize recovery from the party proceeding to trial. Noting this irregularity, the Court of Appeals cited to this Court's opinion in *CertainTeed v. Dexter*, stating that "[e]mpty-chair defendants who have settled are to be treated no differently than participating defendants in regard to what must be proved to apportion fault against them [even t]hough the empty-chair defendant will not actually be held liable in the trial, since it is literally not on trial ..." 330 S.W.3d 64, 74 (Ky. 2010). In an attempt to clarify the rule, the Court of Appeals stated: *"the party who benefits* by the jury's belief in the fault

6

of the empty-chair defendant bears the burden of proving by a preponderance of the evidence every element of the empty-chair defendant's liability, just as if he or she was still exposed to indeterminate liability and still had a presence in the courtroom."

The "crux" of the reversible error found by the Court of Appeals was "the trial court's failure to consider the effect of the shifting burden of proof in an empty-chair defendant tort case." The Court of Appeals determined the directed verdict as to Dr. Sherrard's liability was, therefore, premature. "[W]e would never have permitted a directed verdict at the close of the plaintiff's case against Jewish Hospital – the "participating defendant[]" as *CertainTeed* would call it." Applying the same rule to the scenario before it, the Court of Appeals plainly held: "No directed verdict may be entered against an empty-chair defendant prior to the close of all evidence."

To determine whether such a holding is correct, this Court must first analyze its own precedent in *CertainTeed* to determine the true implications of that case. Additionally, we must probe the rule on directed verdicts and then, applying *CertainTeed*, decide how the rules and precedent must co-exist.

### 1. *CertainTeed v. Dexter*

*CertainTeed v. Dexter* was an asbestos-related products liability case against nineteen separate defendants. 330 S.W.3d at 68. All but two defendants settled or were dismissed from the case, leaving only the two remaining defendants to proceed to trial. *Id.* The other seventeen defendants were considered "empty-chair" defendants at trial. *Id.* Dexter was a pipefitter

7

from 1946 until 1984. *Id.* He was diagnosed with lung cancer and sued the nineteen defendants for products liability and negligence. *Id.* at 69. The nineteen companies either made asbestos products, which Dexter used in his work, or owned buildings in which Dexter was exposed to asbestos. *Id.* At trial, CertainTeed was one of the present defendants; the proof showed that Dexter was only exposed to CertainTeed's products for one week out of his forty-year career. *Id.* Despite a wealth of proof that much of Dexter's exposure was due to the empty-chair defendants, the jury allocated *no* fault to any of the absent defendants. *Id.* The trial court, upon defense motion, granted a new trial because this failure to apportion fault to any empty-chair defendant was manifestly against the evidence. *Id.* at 69-70. On retrial, the jury did allocate fault to some of the empty-chair defendants. *Id.* at 70. Plaintiffs then appealed, arguing that that trial court erred in granting the new trial. *Id.*

Procedurally, this Court addressed the standard of review for a trial court's grant of new trial but, substantively, this Court grappled with how to treat empty-chair defendants for apportionment purposes. *Id.* at 71-74. "Ordinarily, to apportion fault among multiple tortfeasors, the plaintiff must prove each tortfeasor's liability beyond the plaintiff[']s burden of proof[].]" *Id.* at 73. But, when one defendant settles, leaving another defendant at trial, "[t]he burden of proof in such a case is effectively shifted[.]" *Id.* Rather than a plaintiff attempting to maximize all parties' liability, a defendant attempts to shift blame onto another party, minimizing the recovery against them. "[I]t is the participating defendant, not the plaintiff, who seeks to show that the

8

empty-chair defendant is responsible." *Id.* "[T]he participating defendant is merely seeking a reduction of its liability." *Id.* To thus still require a plaintiff to prove liability as to a settling defendant would be counter-productive; it would also disincentivize plaintiffs from settlement in some ways. For what is the point of settlement if a plaintiff must still carry the burden against that defendant for recovery against a separate entity?

To simplify the process and clarify the law, this Court attempted to explain how to treat these absentee defendants:

> Empty-chair defendants who have settled are to be treated no differently than participating defendants in regard to what must be proved to apportion fault against them. Though the empty-chair defendant will not actually be held liable in the trial, since it is literally not on trial, a participating defendant must still prove liability on the part of the tortfeasor onto whom it seeks to shift some of the blame.

*Id.* at 74. This principle is consistent with Kentucky's adoption of comparative fault. *Id.* If the evidence is sufficient to submit an empty-chair defendant's fault to the jury, such an allocation comports with the principles of comparative negligence. *Id.*

The Court then applied the law to Dexter's case. *Id.* at 75-83. Much of the evidence presented, by both Dexter and CertainTeed, showed that Dexter's exposure to asbestos was caused, at least in part, by the empty-chair defendants. *Id.* Thus, the trial court did not err in granting a new trial to provide for apportionment among *all* potentially liable parties, whether those parties were at trial or not. *Id.* at 83. Contrary to the statements of the Court of Appeals in this case, *CertainTeed* was not a broad policy decision, dictating

9

every procedural step in a case with an empty-chair defendant. Rather, the case related to a very specific question: what must a defendant present in its case to create sufficient basis to present the jury with an empty-chair defendant's apportionment of fault? However, as in many areas of the law, a solution to one problem will inevitably lead to further questions. Cases involving empty-chair defendants are complex, to be sure. The immediate case before us presents another such issue: how should trial courts treat empty-chair defendants in motions for directed verdict under Kentucky Rule of Civil Procedure ("CR") 50.01?

## 2. Kentucky Rule of Civil Procedure ("CR") 50.01

CR 50.01, the rule on a motion for directed verdict, states:

> A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

CR 50.01. "Under Kentucky law, a motion for directed verdict ... should be granted only if 'there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ.'" *Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500, 506 (6th Cir. 1998) (quoting *Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 231 (6th Cir. 1997) (quoting *Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. App. 1992))). "The controlling single question on a motion for a directed verdict,

10

either at the close of plaintiff's evidence, or at the close of all evidence, is whether the plaintiff has sustained the burden of proof by 'more than a scintilla of evidence'[.]" *James v. England*, 349 S.W.2d 359, 361 (Ky. 1961) (citing *Wadkins' Adm'x v. Chesapeake & Ohio Railway Co.*, 298 S.W.2d 7 (Ky. 1956)).

However, the language of this precedent leads to the inevitable difficulty in the case before us. The trial court did not grant a directed verdict in the "complete absence of proof on a material issue in the action." Quite to the contrary, the trial court determined there was nothing left for the jury to determine against an absent party and entered a partial directed verdict on an issue of liability. Thus, the trial court determined there was no dispute as to a material issue in the action. The trial court did not question whether the "plaintiff has sustained [its] burden." Under *CertainTeed*, it was *not* the Estate's burden here to prove Dr. Sherrard's liability or lack thereof. Instead, it was Jewish Hospital's burden to present evidence shifting the apportionment of fault to Dr. Sherrard's breach of the standard of care.

Perhaps it is this confusing jumble of questions that presents such a quandary as to the appropriateness of the trial court's actions here. For really, what the court granted was *not* a directed verdict. The court's so-called directed verdict at the close of plaintiff's case was more similar, in practice, to a partial summary judgment as to the issue of Dr. Sherrard's breach of duty. "In Kentucky, ... a ruling on a summary judgment is a more delicate matter and [] its inquiry requires a greater judicial determination and discretion since it

11

takes the case away from the trier of fact before the evidence is actually heard." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 482 (Ky. 1991) (citing *Payne v. Chenault*, 343 S.W.2d 129 (Ky. 1960) and *Rowland v. Miller's Adm'r*, 307 S.W.2d 3 (Ky. 1956)). "There is a great difference between discovering whether there be an issue of fact and deciding such an issue." *Rowland*, 307 S.W.3d at 6 (citing *Farrall v. Dist. of Columbia Amateur Athletic Union*, 153 F.2d 647 (D.C. Cir. 1946)). Here, Jewish Hospital argued that there was "no dispute" as to Dr. Sherrard's breach of the standard of care. In this way, the motion was more like one of a partial summary judgment rather than a directed verdict. However, this does not resolve the issue before this Court because what the trial court granted, and instructed the jury on, was a partial directed verdict. What is still perplexing within this case is the procedural posture of the parties at the time of the motion.

To place this discussion in perspective, let us examine the ordinary issue before a court when determining whether a directed verdict is appropriate. In the criminal context, the Commonwealth presents its case against a defendant. At the close of that evidence, the defendant moves for directed verdict, claiming that the Commonwealth has *failed* to meet its burden in proving the case. The situation presented by Jewish Hospital is quite different. In the same criminal context, the analogous situation would be: the Commonwealth proceeds to trial against two co-defendants. At the close of the Commonwealth's evidence, one co-defendant requests a directed verdict against his co-defendant, claiming there is going to be no evidence to disprove that co-defendant's guilt.

12

To understand and resolve the issue before us, this Court must delve into the mechanics and intent of CR 50.01. There are two types of directed verdicts: (1) "the most common type of directed verdict, where the claimant loses because claimant's proof is inadequate[;]" and (2) "when the claimant's evidence is overwhelming, and in the analogous situations when the evidence on a defense is either inadequate or overwhelming." Michael J. Waggoner, *New Rule 50 May End Directed Verdicts for Plaintiffs*, 22 SW. U.L. REV. 389, 391 (1993). In civil cases, both these types of directed verdicts are available under Kentucky law.[3] *See Droppelman v. Willingham*, 169 S.W.2d 811, 814 (Ky. 1943) ("Directed verdicts for plaintiffs in negligence cases are rare, but when the undisputed evidence points unerringly to negligence of the defendant as the cause of the accident, a direct verdict for the plaintiff is proper."). Importantly, such a directed verdict in *favor* of a plaintiff would only be permissible under CR 50.01 at the close of the defendant's proof. A party may move "for a directed verdict at the *close of the evidence offered by an opponent ...*" CR 50.01. Thus, a plaintiff must properly wait until a defendant has presented its proof before requesting such a directed verdict.[4] What CR 50.01 intends is to

---

[3] The corollary directed verdict for the Commonwealth, or plaintiff, in a criminal case, however, is not procedurally proper. "It is never proper for a trial court to direct a verdict of guilty where there is a plea of not guilty, despite the fact that the evidence of his guilt may be convincing and wholly uncontradicted." *Taylor v. Commonwealth*, 125 S.W.3d 216, 219 (Ky. 2003) (citing *Commonwealth v. Durham*, 57 S.W.3d 829 (Ky. 2001)).

[4] This proposition is supported by a case cited by the Estate, *Sherrard v. Oakley*, 413 S.W.2d 78, 78 (Ky. 1967). There, the Court determined that plaintiffs could not obtain a directed verdict at the close of plaintiffs' evidence. *Id.* "Clearly the trial court had no power to cut off defendant's right to present his case, if he so

13

allow the party *opposing* the motion for directed verdict to have had an opportunity to present its proof prior to being foreclosed from doing such.

The rule clearly encompasses motions for directed verdict by defendants against plaintiffs and plaintiffs against defendants in the proper situation. But, what remains unclear from the language of the rule is whether one defendant may obtain a directed verdict *against* another defendant, at the close of plaintiff's evidence. If Dr. Sherrard had been present at trial, we must hold that the timing of Jewish Hospital's motion was improper. The motion for directed verdict was *against* Dr. Sherrard, not the Estate. Although the Estate had its opportunity to present proof, the party against whom the motion was made had *not* had an opportunity to present its case. CR 50.01 states that the motion for directed verdict is "at the close of the evidence offered by an opponent." The only common-sense understanding of this rule is that the opponent to the motion is the same "opponent" that must have closed its offer of evidence. Thus, in theory, a co-defendant *may* move for directed verdict against another co-defendant but *only* after that co-defendant has presented its proof or declined to present any proof.

This Court's predecessor addressed such an issue in *Lyon v. Prater*, 351 S.W.2d 173 (Ky. 1961). There, the Praters were passengers in Lyon's vehicle. *Id.* at 174-75. The Lyon and Collier vehicles collided, and the Praters sought damages against both parties. *Id.* Collier moved for directed verdict at the

---

desired, by sustaining a motion of the plaintiffs for a directed verdict at the close of their case." *Id.*

14

close of the Praters' evidence. *Id.* at 175. The Court held that "the proper practice before directing a verdict in favor of one of two or more defendants is to allow the other defendant to present his testimony on the question of the liability of each and all the defendants, and evidence of one defendant ... may inculpate the other the same as though proved as a part of the plaintiff's case." *Id.* at 175-76. In other words, the party *against* whom a directed verdict motion is made must have an opportunity to present proof. Pursuant to *Lyon*, even when a co-defendant moves for directed verdict against the plaintiff, the other co-defendant should have an opportunity to present proof. *See id.* This implication is sensible; for one co-defendant's theory of the case may be to shift blame to the other co-defendant, just as was the case in the trial below. Thus, before directing a verdict, it is practical to allow all the potential proof against the party making the motion to be entered and considered by the trial court.

Yet, Dr. Sherrard was not at trial. If he had been, his attorney would have likely made this argument upon Jewish Hospital's motion for directed verdict. Dr. Sherrard had no opportunity to present proof and any such directed verdict must wait until after such opportunity has been provided. But Dr. Sherrard, as stated, was not present at trial. He was not going to present any proof in response to the Estate's case. So what effect does it create when one of these co-defendants is not a present, physical party at trial? To understand the interplay between CR 50.01 and this Court's case law on empty-chair defendants, we must apply the law of *CertainTeed* to CR 50.01.

15

### 3. Applying *CertainTeed* to CR 50.01

"Empty-chair defendants who have settled are to be treated no differently than participating defendants in regard to what must be proved to apportion fault against them." *CertainTeed*, 330 S.W.3d at 74. The Court of Appeals determined that this rule should be extended to mean that empty-chair defendants who have settled should be treated no differently than participating defendants. The Court of Appeals, in essence, removed the pivotal caveat to the *CertainTeed* rule: empty-chair defendants must be treated the same as participating defendants when *determining apportionment of fault*. The rule was crafted to comport with comparative fault principles to address a specific issue: how to deal with apportionment after one defendant, but not all defendants, has settled. In such a situation, "it is the participating defendant, not the plaintiff, who seeks to show that the empty-chair defendant is responsible." *Id.* at 73. "[T]he participating defendant is merely seeking a reduction of its liability." *Id.* The *CertainTeed* rule is not automatic; empty-chair defendants should not, under any and all possible circumstances, be considered exactly the same as participating defendants. Such a bright-line rule would inevitably create confusion. However, if allocation of fault is concomitant to the issue before the court, then the courts must endeavor to apply the *CertainTeed* rule and treat empty-chair defendants the same as present defendants to protect the rights of all the parties involved.

The question then becomes whether this procedural oddity—a present defendant seeking a directed verdict against an empty-chair defendant—is also

16

so intertwined with the apportionment of fault issue as to apply the *CertainTeed* rule and require us to treat the empty-chair defendant the same as the present defendant. This Court holds that Jewish Hospital's motion for directed verdict *against* Dr. Sherrard clearly implicates apportionment of fault. Jewish Hospital's entire motivation in showing Dr. Sherrard had, in fact, breached his standard of care, was to minimize or eliminate its own liability for Laura's death. As such, the apportionment of fault becomes an issue and we must apply the *CertainTeed* rule. We must treat the motion as though Dr. Sherrard was present at trial, just as any other participating defendant.

If Jewish Hospital had moved for directed verdict at the close of the Estate's evidence, and Dr. Sherrard had been present, the trial court's grant would clearly be in error. Dr. Sherrard had no opportunity to present evidence and defend himself. Under *Lyon*, the court should have permitted each co-defendant to present its case before entertaining any directed verdict motions against any of those parties. *See* 351 S.W.2d at 175-176. Even under the clear language of CR 50.01, the motion was not made at the close of the evidence of the party against whom the motion was made. Granting this procedurally defunct directed verdict was clearly in error. We decline to hold as broadly as the Court of Appeals and say that such a directed verdict is *always* in error. However, in applying the *CertainTeed* rule and CR 50.01, we hold that the directed verdict at issue *here* was in error. As such, instructing the jury as to Dr. Sherrard's breach of duty, reflecting the erroneous directed

17

verdict, was also in error. But, we must determine whether, as Jewish Hospital argues, that error was merely harmless and does not require reversal.

## B. WAS THE ERROR IN GRANTING DIRECTED VERDICT HARMLESS?

It is a "settled maxim that 'erroneous jury instructions are presumed to be prejudicial[.]" *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018) (quoting *Mason v. Commonwealth*, 331 S.W.3d 610, 623 (Ky. 2011) (citing *Harp v. Commonwealth*, 266 S.W.3d 813, 818 (Ky. 2008))). However, this Court has, on occasion, determined such error does not require reversal if the "presumption [of prejudice] can be successfully rebutted upon a showing that the error was harmless." *Caudill*, 540 S.W.3d at 367 (quoting *Commonwealth v. McCombs*, 304 S.W.3d 676, 680 (Ky. 2009) (citing *Harp*, 266 S.W.3d at 818)); *see also Weaver v. Brooks*, 350 S.W.2d 639, 640 (Ky. 1961) (citing *Miller v. Miller*, 296 S.W.2d 684 (Ky. 1956)) (Stating that "technically incorrect instructions are not grounds for reversal where the rights of the losing party are not prejudiced."). "[T]he party defending the erroneous instruction bears the burden of showing that no prejudice resulted." *Sargent v. Shaffer*, 467 S.W.3d 198, 212 (Ky. 2015) (citing *McKinney v. Heisel*, 947 S.W.2d 32, 35 (Ky. 1997)).

The burden is upon Jewish Hospital to show that the Estate was not prejudiced by the erroneous instruction here and that reversal is, thus, not required. The Estate asserts that the jury could have easily been improperly swayed by the instruction as to Dr. Sherrard's breach of duty, leading to the prejudicial verdict against the Estate. To meet its burden, Jewish Hospital

18

states that, at trial, it never argued that Dr. Sherrard's negligence *caused* Laura's death. Instead, its argument was that any failure in Dr. Sherrard's care did not lead to Laura's death. Its argument in closing refuted any negligence on Jewish Hospital's part but, alternatively, any negligence in either Nurse Johnston or Dr. Sherrard's conduct was not the legal *cause* of Laura's untimely death. However, the core of Jewish Hospital's harmless error argument is that, because the instruction as to Dr. Sherrard's breach of care (Instruction No. 2) was *after* Jewish Hospital's liability instruction (Instruction No. 1), and the jury stopped with Instruction No. 1, then the jury *never reached* Instruction No. 2 regarding Dr. Sherrard.

Ironically, here, we have a war between two presumptions. It is a "settled maxim that 'erroneous jury instructions are presumed to be prejudicial[.]'" *Caudill*, 540 S.W.3d at 367 (quoting *Mason*, 331 S.W.3d at 623 (citing *Harp*, 266 S.W.3d at 818)). However, "[i]t is [also] presumed that the jury will follow instructions issued to it by the trial court." *Morgan v. Scott*, 291 S.W.3d 622, 643 (Ky. 2009) (citing *Johnson v. Commonwealth*, 105 S.W.3d 430, 436 (Ky. 2003) (quoting *Scobee v. Donahue*, 164 S.W.2d 947, 949 (Ky. 1942))). We presume instructions to be prejudicial, but we also presume that the jury followed the instructions before it. If the jury did so here, then it did not utilize Instruction No. 2 in deciding that Jewish Hospital had no liability in Laura's death. The jury instructions, at issue here, stated:

19

INSTRUCTION NO. 1
NEGLIGENCE OF JEWISH HOSPITAL SOUTH

It was the duty of Jewish Hospital & St. Mary's Healthcare, Inc. d/b/a Jewish Hospital Medical Center South (referred to hereafter in these instructions as "Jewish Hospital South") and its employees to exercise toward Laura Alexander that degree of care of and skill ordinarily expected of reasonable and prudent hospitals under similar circumstances. If you are satisfied from the evidence that they failed to comply with that duty and that such failure on their part was a substantial factor in causing the death of Laura Alexander, you will find for the plaintiffs; otherwise you will find for the hospital.

**Please Proceed to Interrogatory No. 1**
INTERROGATORY NO. 1
NEGLIGENCE OF JEWISH HOSPITAL SOUTH

Do you believe from the evidence that Jewish Hospital South and its employees failed to exercise the degree of care and skill ordinarily expected of reasonable and prudent hospitals under similar circumstances and that such failure on their part was a substantial factor in causing the death of Laura Alexander?

[Yes/No and signature lines]

**If you answered "no" to Interrogatory No. 1 you have completed your deliberations and you should inform the Bailiff. If you have answered "yes" to Interrogatory No. 1 you shall proceed to Instruction No. 2.**

INSTRUCTION NO. 2

It was the duty of Dr. Charles D. Sherrard, Jr. in treating and attending Laura Alexander to exercise the degree of care and skill expected of a reasonably competent physician acting under similar circumstances. Dr. Charles D. Sherrard failed to comply with that duty. If you are satisfied from the evidence that such failure was a substantial factor in causing Laura Alexander's death, you will find for the Plaintiffs. Otherwise you will find for Dr. Sherrard.

**Proceed to Interrogatory No.2.**
INTERROGATORY NO. 2
NEGLIGENCE OF Dr. CHARLES D. SHERRARD,[] JR.

Do you believe from the evidence that Dr. Charles D. Sherrard, Jr.'s failure to comply with his duty to exercise the degree of care and skill expected of a reasonably competent physician acting under similar circumstances was a substantial factor in causing Laura Alexander's death?

[Yes/No and signature lines]

**Proceed to Instruction No. 3.**

The jurors checked "No" after Interrogatory No. 1, nine jurors and the foreman signed the signature lines, and the jury then returned to the courtroom. Here,

although the instructions are presumed to be prejudicial, we hold that the evidence from the record proves that any error here was harmless.

Admittedly, the trial judge read through the entirety of the jury instructions before closing arguments. Thus, although the jury may not have reached Instruction No. 2 in its deliberations, it heard the content of that instruction prior to the close of the case. The jury heard that there had already been a finding that Dr. Sherrard's conduct fell below the standard of care. Jewish Hospital did reiterate this fact, referencing that the judge had made this finding, during its closing argument.

However, these potential prejudices are outweighed by the proof in the record that this instruction was harmless. The implication of Instruction No. 2 is that Dr. Sherrard was at fault, at least in part, for Laura's death. In the Estate's opening statement, it blatantly stated that "Dr. Sherrard has some blame in this case. His care was not exemplary ..." The Estate was also clearly on notice that Jewish Hospital intended to pursue this line of defense. During Jewish Hospital's opening statement, it said that Dr. Sherrard's involvement was important. Jewish Hospital told the jury that the plaintiff's evidence would show Dr. Sherrard fell below the standard of care, that he should not have discharged Laura, and that he had a duty independent from Nurse Johnston.

During closing arguments, Jewish Hospital reiterated Dr. Sherrard's fault. It did state that the judge had found that his conduct fell below the standard of care. However, counsel told the jury it must determine whether this conduct caused Laura's death and counsel argued that it had not caused

21

her tragic death. Importantly, the Estate did not object to any of these statements as to Dr. Sherrard's involvement. The Estate made similar statements in its closing as it did in opening. Counsel reiterated that Dr. Sherrard "made a mistake" and "made an incorrect diagnosis." He stated once again that they all know Dr. Sherrard did not meet the standard of care; he stated their experts had always maintained that. But, the Estate's counsel argued, that failure had not been a substantial factor in Laura's death.

The Estate argues the instruction on Dr. Sherrard's fault clouded the jury's verdict. Yet, the jury was also read the instruction that allowed it to find fault against *both* Dr. Sherrard and Jewish Hospital. During closing arguments, both Jewish Hospital and the Estate discussed this apportionment and explained how the jury could divide fault among the parties. If we follow the Estate's logic, then the jury would have understood from all these instructions that finding fault as to Dr. Sherrard did not foreclose the option of finding Jewish Hospital liable.

The Estate cannot claim prejudice from a statement that Dr. Sherrard had some fault in Laura's death when it repeatedly made that same argument throughout trial proceedings. We find it persuasive that the jury returned to the courtroom after answering Interrogatory No. 1. Because it is presumed to follow instructions, that necessarily means that it did not review Instruction No. 2 when making its final decision. Additionally, if the court had *not* granted a directed verdict as to Dr. Sherrard's liability, Jewish Hospital could still have made the same arguments, subject to any relevant rules of evidence. The

22

defense would have been practically identical, except it would have had a present defendant fighting against its liability argument. This Court is satisfied from a thorough review of the record that the presence of this erroneous instruction had no effect on the jury's verdict.

## IV. CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals and reinstate the judgment of the Bullitt Circuit Court. Although we agree with some of the Court of Appeals' reasoning, we take this opportunity to refine and explain our prior ruling in *CertainTeed*. Based on that ruling, we hold that a directed verdict by a present defendant against an empty-chair defendant falls under the *CertainTeed* rule. Therefore, the empty-chair defendant must be treated the same as any other defendant in the case within this scenario. Jewish Hospital's motion for directed verdict was procedurally infirm and the trial court's granting of the directed verdict was in error. However, after thoroughly reviewing the record, we find such error was harmless. We thus reinstate the judgment of the Bullitt Circuit Court.

All sitting. Minton, C.J., Cunningham, Hughes, Keller, VanMeter and Venters, JJ., concur. Wright, J., concurs in result only.

23

COUNSEL FOR APPELLANT:

William Kennedy Simpson
Joseph Wright
Thompson, Miller & Simpson, PLC


COUNSEL FOR APPELLEES:

Ronald Wilt
Stephen Klausing Jr.
Wilt & Klausing, PLLC

James David Ballinger
Ballinger Law, PLLC