Ambreen FRASER, M.D., Appellant

v.

Matthew MILLER, Appellee.

No. 2012–SC–000829–DG.

Supreme Court of Kentucky.

April 17, 2014.

John D. Cole, Frank Hampton Moore, Jr., Matthew Porter Cook, Counsel for Appellant.

Brian Lee Schuette, Counsel for Appellee.

Opinion of the Court by Justice CUNNINGHAM.

On the night of January 8, 2008, Matthew Miller, who was sixteen years old at the time, sought treatment at the UrgentCare Clinic in Bowling Green, Kentucky. Miller was experiencing nausea and vomiting, along with an acute headache. Dr. Ambreen Fraser was the treating physician on the night in question. Dr. Fraser diagnosed Miller with gastritis, a condition in which the stomach lining becomes inflamed and irritated. In treating Miller, Dr. Fraser administered Phenergan, an anti-nausea medication; Rocephin, an antibiotic; and a single 60 mg injection of Ketorolac Tromethamine ("Ketorolac"), a non-steroidal anti-inflammatory drug.

After receiving treatment, Miller went home. The next day, Miller was still experiencing nausea and vomiting and he returned to UrgentCare. The attending physician, Dr. Medhat Grace, sent Miller to the emergency room at Greenview Regional Hospital. A CT scan was performed which revealed that Miller was suffering from renal cortical necrosis, an irreversible form of kidney failure. Miller was then transferred to Vanderbilt University Medical Center. While there, Miller was also diagnosed with pancreatitis.

Miller remained at Vanderbilt University Medical Center for three weeks receiving three weekly treatments of dialysis. He then went home and began peritoneal dialysis each night. Approximately fifteen months later, Miller received a kidney transplant from a deceased donor.

On December 1, 2008, Miller filed a medical malpractice suit against Dr. Fraser, UrgentCare Clinic, and Dr. Grace. Miller alleged that Dr. Fraser dispensed a toxic dose of Ketorolac, causing him to suffer renal failure. Miller sought over twenty million dollars in damages, including past and future medical expenses, future loss of wages due to his life expectancy decreasing by twenty years, and punitive damages. Miller's claims against UrgentCare and Dr. Grace were later dismissed with prejudice.

The case proceeded to trial on May 3, 2011. It was Miller's position that Dr. Fraser knew the risks associated with prescribing Ketorolac to a dehydrated patient, but proceeded anyway. Miller presented proof that the Federal Food and Drug Administration had posted a Black Boxed Warning concerning Ketorolac. It stated that the drug is contraindicated in patients with advanced renal impairment, especially in those patients at risk for renal failure due to dehydration. Miller's expert witnesses opined that Miller was dehydrated

prior to receiving the Ketorolac injection. On the other hand, Dr. Fraser put forth evidence that Miller did not appear to be dehydrated or volume depleted at the time of treatment. It was Dr. Fraser's defense that pancreatitis was the cause of Miller's renal failure.

The jury returned a verdict in favor of Dr. Fraser. The instructions indicate that the jury did not believe that the Ketorolac injection was a substantial factor in causing Miller's kidney failure. On May 13, 2011, the trial court entered a final judgment, which Miller appealed. Dr. Fraser also cross-appealed the trial court's order denying her motion for a directed verdict and motion for summary judgment as to Miller's informed consent claim. The Court of Appeals consolidated the matters.

Miller presented the Court of Appeals with two issues. First, Miller argued that the trial court abused its discretion in disallowing the testimony of an expert witness to rebut or answer a juror's question. Secondly, Miller contended that the trial court erred in ruling that he could not present to the jury his claim of negligence based on Dr. Fraser's failure to obtain informed consent. The Court of Appeals declined to address Miller's first issue, instead finding that the trial court committed reversible error as to the second issue. In regards to Dr. Fraser's appeal, the Court of Appeals decided that the trial court properly denied both motions. Dr. Fraser appealed and we granted discretionary review.

### Rebuttal Witness

■ During his case-in-chief, Miller called Dr. Gold, an Atlanta-based pediatric gastroenterologist, as an expert witness. Dr. Gold explained that pancreatitis would only cause irreversible kidney failure if it was classified as severe. Dr. Gold then identified and applied six different scales used to rate the severity of pancreatitis.

In his opinion, Dr. Gold believed Miller's pancreatitis was mild to moderate. Consequently, Dr. Gold testified that pancreatitis was not the cause of Miller's renal failure. Dr. Gold opined that the Ketorolac injection was to blame.

The day after Dr. Gold's testimony, a juror approached the bench and posed a question. The juror asked, "How long does pancreatitis have to be present in order for kidney failure to happen?" At this point, Miller was still presenting his case-in-chief. Miller informed the court that he would like to recall Dr. Gold to answer the juror's question. Unfortunately, Dr. Gold had already returned to Atlanta. Miller suggested that the parties depose Dr. Gold via speaker phone and then he would offer any relevant testimony on rebuttal. The trial judge ruled that Miller could not present Dr. Gold as a witness upon rebuttal.

■ Civil Rule ("CR") 43.02 sets forth the order of presentation of proof during a trial. The rule makes clear that the party with the burden of proof must first produce evidence and should "exhaust his evidence before the other begins." CR 43.02(c). The rule further permits the trial court to allow the parties to rebut evidence "for good reasons in furtherance of justice." CR 43.02(d). It is within the sound discretion of the trial court to regulate the order of presentation of proof during a trial. *Commonwealth, Dept. of Highways v. Ochsner*, 392 S.W.2d 446, 448 (Ky.1965). The test to determine if the trial court abused its discretion is to ask whether its decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

■ Rebuttal evidence is evidence that "tends to counteract or overcome the legal effect of the evidence for the other side."

*Reserve Loan Life Ins. Co. v. Boreing,* 157 Ky. 730, 163 S.W. 1085, 1087 (1914). The sole reason Miller desired to recall Dr. Gold was to have him answer the juror's question, not to discredit any proof put on by Dr. Fraser. In fact, the trial court did not allow witnesses for the defense to answer the juror's question. Thusly, there would be no issue for Miller to rebut. Furthermore, " '[r]ebuttal testimony offered by the plaintiff should rebut the testimony brought out by the defendant and should consist of nothing which could have been offered in chief.' " *Ochsner,* 392 S.W.2d at 448, *quoting* 53 Am.Jur. 107 (Trial, § 121). Miller was well aware of the defense's causation theory. If Miller believed the duration of pancreatitis was an important topic to explore, he should have done so in his case-in-chief.

■ Both sides have mischaracterized the potential answer to the juror's question as "rebuttal." It is not. To seek answers to questions posed by jurors after a witness has been discharged invites confusion and chaos. Also, while we see value in jurors being allowed to ask questions at trial, such inquiries must be timely. Trial courts allowing such a practice should admonish the jury at the beginning of the trial that any questions for a witness must be posed while the witness is still on the stand.

Furthermore, even assuming *arguendo* that Dr. Gold's anticipated testimony could be classified as rebuttal evidence, we still have reservations as to whether its admission would have furthered justice. Dr. Gold was clear that only severe pancreatitis would have caused Miller's renal failure. In evaluating the severity of Miller's pancreatitis, Dr. Gold discussed applicable scoring systems which combined factors such as his age, health, and laboratory data. At no point did Dr. Gold state that the duration of Miller's pancreatitis was a factor to take into account. Likewise, while Dr. Fraser's experts testified that renal failure is a complication of pancreatitis, none of her experts discussed the effects of the disease's duration. Accordingly, this Court does not believe that the length of time Miller suffered from pancreatitis was a critical issue.

Therefore, we find that the trial court acted well within its discretion in prohibiting Miller from recalling Dr. Gold since his anticipated testimony did not qualify as rebuttal evidence and was arguably irrelevant.

### Informed Consent

■ The second and final issue on appeal is whether the trial court erred in barring Miller from presenting to the jury his claim that Dr. Fraser failed to obtain his informed consent. Dr. Fraser maintains that this issue is not preserved for our review. We agree.

Prior to trial, Dr. Fraser submitted a motion for summary judgment on the issue of informed consent. It was Dr. Fraser's position that Kentucky law did not require her to obtain Miller's informed consent because Ketorolac is a therapeutic drug not falling within the purviews of Kentucky Revised Statute 304.40–320. The trial court denied Dr. Fraser's motion and the case proceeded to trial.

During the trial, Dr. Fraser moved the court to enter a directed verdict on Miller's informed consent claim. Miller did not object or respond to Dr. Fraser's motion. The trial court agreed with Dr. Fraser that Kentucky law does not allow for a separate informed consent claim based on the administration of a therapeutic drug. The trial court also found that Miller had failed to present expert testimony that Dr. Fraser deviated from the standard of care by not obtaining Miller's informed consent. For those reasons, the trial court ruled

that Miller could not present to the jury his informed consent claim.

Whether an informed consent claim can be based on the administration of a therapeutic drug is a novel question. However, this Court will refrain from evaluating the merits of this issue because we believe that it is unpreserved for our review. Miller failed to respond or object to Dr. Fraser's motion for a directed verdict. He cannot now complain on appeal. Moreover, pursuant to CR 51(3), Miller failed to tender to the trial court an informed consent jury instruction or an objection to the trial court's final instructions. *See Burke Enterprises, Inc. v. Mitchell,* 700 S.W.2d 789, 792 (Ky.1985) ("The movant lost the right to make this argument by failing to object to the language of the instruction or to submit an alternative instruction....."). Thusly, this issue is unpreserved and the Court of Appeals' opinion must be reversed.

### Conclusion

For the foregoing reasons, we reverse the opinion of the Court of Appeals and hereby reinstate the judgment of the Warren Circuit Court.

MINTON, C.J.; ABRAMSON, SCOTT and VENTERS, JJ., concur. KELLER, J., concurs by separate opinion in which NOBLE, J., joins.

KELLER, J., Concurring:

I concur with my colleagues in this case but write separately as to the issue of informed consent. The majority holds that Miller did not preserve the informed consent issue for two reasons. First, the majority asserts that Miller failed to preserve the informed consent issue when Dr. Fraser moved the court to enter a directed verdict claim on that issue. Second, the majority holds that Miller failed to preserve the informed consent issue by failing to tender a jury instruction regarding informed consent or object to the court's final jury instructions, which did not discuss informed consent.

At the end of Miller's case-in-chief, Dr. Fraser made a directed verdict motion regarding the informed consent issue. As the majority notes, Miller did not object or respond. However, while the aforementioned facts are correct, I believe Miller preserved the issue prior to Dr. Fraser's motion for directed verdict. Near the end of the second day of trial, counsel began questioning Miller's father regarding informed consent issues. Dr. Fraser objected to those questions, the judge called a bench conference to discuss the informed consent issue, and he sustained Dr. Fraser's objection. Miller requested the opportunity to put on proof regarding the informed consent issue by avowal. At the end of Tuesday, the judge dismissed the jury and allowed Miller's counsel to take Miller's father's informed consent testimony by avowal.[1]

At the beginning of the third day of trial, the judge called a bench conference to discuss the informed consent issue again. Dr. Fraser argued that Miller should not be allowed to argue informed consent to the jury because there was not sufficient expert testimony to support that argument; additionally, Dr. Fraser argued that informed consent is not required for the use of prescription pain medication.

Miller argued KRS 304.40–320 regulates when informed consent must be obtained and encompasses all treatment. He also argued that, pursuant to *Keel v. St. Eliza-*

---

1. I note that Miller also put on avowal testimony from Miller's mother regarding in-

formed consent.

beth Medical Center, 842 S.W.2d 860 (Ky. 1992), expert testimony is not required to argue a lack of informed consent. Based on the preceding, Miller contended that he was entitled to present evidence regarding informed consent without expert testimony. The judge ruled for Dr. Fraser, stating, in essence, that an expert opinion is necessary to establish when informed consent is an element of the standard of care.

To preserve an issue regarding the exclusion of evidence, Miller was required to make an offer of proof. Kentucky Rule of Evidence (KRE)(1)(a)(2). Miller did this, thus, he preserved the issue for appeal.

Furthermore, I disagree with that part of the majority's opinion that states that Miller was required to tender a jury instruction on informed consent to preserve that issue. In support of that statement, the majority relies on CR 51(3), a reliance that I believe is misplaced. CR 51(3) requires an offer of alternative jury instructions or an objection to the present jury instructions to preserve an issue for appeal. Miller was not required to tender a jury instruction on the issue of informed consent to preserve the issue because the court had ruled evidence on that issue was inadmissible. A litigant cannot be required to offer a jury instruction encompassing evidence that was not presented to the jury in order to preserve an argument that the evidence was wrongfully excluded. In other words, counsel is not required to tender jury instructions to preserve every adverse evidentiary ruling made by the court. Therefore, I would hold that Miller's failure to offer a jury instruction on informed consent was of no consequence and I would hold that Miller properly preserved the issue of informed consent for our review.

Having determined that the issue was properly preserved, I concur with the result reached by the majority because I believe that Miller was required to produce expert testimony regarding informed consent in this case. As noted by the Court of Appeals, informed consent may be an element in an "action brought for treating, examining, or operating on a claimant." KRS 304.40–320. Miller argues that the administration of prescription drugs falls under the definition of treating a patient, thus requiring a physician to obtain informed consent. However, KRS 304.40–320 does not require a physician to obtain informed consent, it simply states when informed consent shall be deemed to have been obtained. Whether it is necessary to obtain informed consent regarding specific treatment is an element of the standard of care. Obtaining informed consent may be a necessary part of the standard of care in some instances, but not in others. Unless the need to obtain informed consent in a specific situation is so apparent that a layman can easily recognize it, expert testimony is necessary to establish if obtaining consent is within the standard of care. See Keel, 842 S.W.2d at 862. Therefore, I agree with the trial court that, in this case, Miller was required to present expert testimony that obtaining specific informed consent before administering Ketoralac is an issue that falls within the standard of care regarding the administration of that drug.

I recognize Miller's argument that this case is governed by Keel. However, his reliance on that case is misplaced. In Keel, the defendant offered "no information whatsoever" to the plaintiff prior to treatment. Id. Miller relies on the following language from Keel: "If we are to analogize consent actions to negligence actions, we must also acknowledge that a failure adequately to inform the patient need not be established by expert testimony where the failure is so apparent that laymen may easily recognize it or infer it

*from evidence within the realm of common knowledge."* *Id.* (Emphasis added.) As noted above, whether it is necessary within the applicable standard of care to obtain specific informed consent when administering a drug in an outpatient setting cannot be deemed so apparent that a layman could easily recognize it. Therefore, expert testimony is necessary. Furthermore, unlike in *Keel,* wherein the plaintiff obtained no information, Miller received and signed a general consent to treat when he presented as a patient at the urgent care center.

Finally on this issue, I note *Keel* has been criticized by subsequent cases. *See Dixon v. United States,* 178 F.3d 1294 (6th Cir.1999) (finding that expert testimony was required to argue informed consent where the plaintiff signed a consent form as to primary risks associated with surgery); and *Hawkins v. Rosenbloom,* 17 S.W.3d 116, 119 (Ky.App.1999) (maintaining that *Keel* should be limited to situations in which no information is given to the patient prior to treatment or surgery and that expert testimony is required to define the standard of care in an informed consent argument). Therefore, I am not persuaded by Miller's use of *Keel* in this matter.

In conclusion, I agree with the result reached by the majority, but for different reasons. Therefore, I concur.

NOBLE, J., joins this concurring opinion.