RENDERED: JANUARY 8, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1040-MR

JAMES D. SERAPHINE, AS EXECUTOR FOR
THE ESTATE OF JAMES G. SERAPHINE; and
JASON SERAPHINE, AS EXECUTOR FOR
THE ESTATE OF JANE CAROLYN SERAPHINE          APPELLANTS


APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE MITCHELL PERRY, JUDGE
ACTION NO. 16-CI-002443


BULLITT VENTURES, INC., d/b/a
SHONEY'S RESTAURANTS OF KENTUCKY;
SECURA INSURANCE, A MUTUAL COMPANY;
and BAPTIST HEALTHCARE SYSTEM, INC.          APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: COMBS, JONES, AND MCNEILL, JUDGES.

JONES, JUDGE: Appellant, James G. Seraphine, initiated the underlying action in

Jefferson Circuit Court against Bullitt Ventures, Inc., d/b/a Shoney's Restaurants

of Kentucky ("Shoney's") and Baptist Healthcare System, Inc. ("Baptist") after his

wife tripped and fell on a floormat at a Shoney's restaurant, breaking her arm, and died two days later after surgery performed at Baptist. Mr. Seraphine sought damages from both Shoney's and Baptist for negligence and wrongful death. After the close of evidence at trial, the trial court granted directed verdicts to Shoney's on the issues of wrongful death and punitive damages. The deliberating jury returned verdicts in favor of Shoney's and Baptist on the remaining claims. Mr. Seraphine appealed, raising numerous issues of error by the trial court. Having reviewed the record and being otherwise sufficiently advised, we affirm.

## I.  BACKGROUND AND PROCEDURAL HISTORY

On Thanksgiving Day, November 26, 2015, 68-year-old Jane Carolyn Seraphine and her husband, James G. Seraphine, stopped to get breakfast at their local Shoney's restaurant, owned by Bullitt Ventures, Inc., in Louisville, Kentucky. After exiting their vehicle, Mrs. Seraphine and her husband made their way toward the restaurant's main entrance; Mrs. Seraphine's view through Shoney's glass front door of the floor and floormat inside the restaurant was unobstructed. A local fireman who had been dining in the restaurant moved to open the door for Mrs. Seraphine. As she thanked him for holding the door and passed through the threshold, Mrs. Seraphine's foot caught in a loop in the restaurant's floormat, causing her to trip and fall on her left arm. She sustained a serious arm fracture as a result of her fall.

Mrs. Seraphine's fall was captured on video by a security camera covering Shoney's vestibule area. According to the video footage, the floormat had lain flat before and after Mrs. Seraphine's fall. A number of other customers traversed the floormat that morning without incident. After Mrs. Seraphine's fall, another firefighter motioned for the restaurant's manager to remove the floormat from the entry way, which he did. The video then showed that the manager later returned the mat to its former position on the floor. The video also revealed that a Shoney's employee had mopped the area of the floor underneath the floormat earlier that morning.

The floormat at issue was owned and maintained by Aramark, a company that, among other things, leases floormats to commercial establishments, like Shoney's. The mat had been delivered to Shoney's by Aramark two days prior to Mrs. Seraphine's fall, after it had been out of service for a week for cleaning. As usual, the mat had been inspected and laundered by Aramark on a biweekly basis and had not been deemed by Aramark to be defective. In fact, Mr. and Mrs. Seraphine had encountered that same floormat every other week since 2012 four to six times a week and had never experienced any problems.

After Mrs. Seraphine's fall, Mr. Seraphine drove her to Baptist Health Louisville, where she was evaluated in the Emergency Department for a primary complaint of right shoulder pain. An x-ray of her right arm revealed a severely

comminuted (or splintered) fracture of the humerus bone with moderate displacement. Upon consultation, orthopedic surgeon Dr. Madhusan Yakkanti recommended surgical repair. Due to Mrs. Seraphine's complex medical history of diabetes, hypertension, knee surgery, stroke, and carotid endarterectomy, the surgery was delayed until Mrs. Seraphine could be medically cleared for the procedure.

The following morning, the hospitalist service determined that Mrs. Seraphine was "medically stable for surgery." Dr. Yakkanti examined Mrs. Seraphine and the results of the CT scan of her right shoulder again, discussing his opinion on the need for surgery with the Seraphine family. He believed that the severity of the bone displacement made non-operative management of the fracture unlikely to be successful.

On November 28th, two days after her fall, Mrs. Seraphine underwent surgery by Dr. Yakkanti. Although Dr. Yakkanti's operative notes described the surgery as largely uneventful, the fracture repair had been complicated, and he had to use several different devices to stabilize a number of bone fragments.

Following her initial recovery in the post-operative recovery room, Mrs. Seraphine was transferred back to the orthopedic floor of Baptist Heath around 2:00 p.m. Over the next several hours of observation, the nurses on duty noted that Mrs. Seraphine's vital signs remained stable, and she was given two

Percocet tablets for pain as ordered. Around 7:00 p.m., Nurse Kristina Thomas performed her initial nursing assessment following the nursing shift change, charting that Mrs. Seraphine was drowsy but arousable, and her vital signs were still consistent.

At 10:00 p.m. that night, Mrs. Seraphine's condition unexpectedly changed. Her vital signs were no longer stable – her blood pressure had dropped, and her oxygen saturation levels had decreased. Nurse Thomas immediately summoned the hospital's Rapid Response Team ("RRT") to assist with evaluation and treatment. Upon their prompt arrival, RRT assessed Mrs. Seraphine's condition and increased her oxygen via a continued positive airway pressure ("CPAP") mask, administered intravenous saline, and gave her Narcan to reverse the sedative and depressive effects of the previously administered narcotic pain medication.

Mrs. Seraphine immediately responded to the Narcan, becoming more alert with improved vital signs, and RRT determined that Mrs. Seraphine did not need to be moved emergently to a higher level of care. Nurse Thomas documented at 10:25 p.m. that she notified Dr. Yakkanti, detailing the interventions performed by RRT and Mrs. Seraphine's overall condition. Dr. Yakkanti ordered that Mrs. Seraphine's pain medications be discontinued and decided not to transfer her to a higher level of care.

By 11:20 p.m., Mrs. Seraphine's vitals, although stable, had not significantly improved since the RRT's intervention, and her level of consciousness had decreased. Nurse Thomas again called Dr. Yakkanti to report Mrs. Seraphine's status. He ordered Mrs. Seraphine to be transferred to a telemetry unit for increased monitoring. However, before the transfer could be accomplished, Mrs. Seraphine went into sudden cardiorespiratory arrest, necessitating resuscitation by Baptist staff. She never regained consciousness. Mrs. Seraphine suffered three more cardiorespiratory arrests before 4:00 a.m. Baptist determined that Mrs. Seraphine had sustained a severe anoxic brain injury, and the family decided to withdraw artificial life-preserving measures. Mrs. Seraphine passed away at approximately 6:56 p.m. on December 1, 2015.

On May 25, 2016, Mr. Seraphine filed suit both individually and as the executor of Mrs. Seraphine's Estate in Jefferson Circuit Court against Shoney's, alleging that Shoney's had been negligent in its utilization and placement of its floormat, resulting in the injury and wrongful death of Mrs. Seraphine.[1] On October 26, 2016, Mr. Seraphine filed his first amended complaint to include Dr. Yakkanti and Baptist as defendants, alleging that their medical

---

[1] The initial complaint also named Secura Insurance, alleging that the insurance company had acted in bad faith in refusing to offer a settlement for Mrs. Seraphine's injury and avoid litigation. On June 21, 2016, the parties agreed to bifurcate the bad-faith claims and hold those in abeyance until the underlying tort claims had been fully resolved.

negligence led to Mrs. Seraphine's wrongful death. However, on April 28, 2017, well before this matter reached trial, all parties entered an agreed order dismissing Dr. Yakkanti as a party. On April 10, 2019, less than a month before trial, Shoney's filed a third-party complaint seeking to name Aramark as a third-party defendant, which the trial court promptly denied.

The parties presented various evidentiary arguments in their pretrial motions *in limine*, which the trial court heard at the final pretrial conference on May 1, 2019. That same day, Shoney's moved for summary judgment on the issue of punitive damages. The trial court denied the motion.

On May 6, 2019, the trial court entered an order denying the defendants' motions to bifurcate the trial against Baptist and Shoney's. According to the trial court, the claims were too "inextricably intertwined" to be bifurcated and splitting the claims would likely lead to jury confusion and prejudice. Record ("R.") at 1859. The trial court also determined that judicial economy favored a single trial.

The case was tried before a jury from May 7 to May 17, 2019.[2] At the conclusion of evidence, Shoney's filed written motions for directed verdicts on the

---

[2] Mr. Seraphine passed away during the trial and was replaced by his son, James D. Seraphine, as the executor for the Estate of James Glenn Seraphine. The jury was not informed of Mr. Seraphine's death until after the verdict was entered. For the sake of simplicity, we continue to refer to the Appellant James D. Seraphine as "Mr. Seraphine."

premises liability and wrongful death claims. Shoney's argued that Mr. Seraphine's wrongful death claim was premised entirely on evidence that Mrs. Seraphine's death as a result of shock would not have occurred but for Baptist's failure to recognize and treat Mrs. Seraphine's shock. According to Shoney's, Mrs. Seraphine's fall at the restaurant was not a substantial factor in her death because but for Baptist's alleged negligence, Mrs. Seraphine would not have died. The trial court agreed with Shoney's regarding wrongful death, holding:

> I see two different stories here: the slip and fall and, at some point, . . . the Plaintiff's proof is that she should have survived the surgery and, but for the negligence of the hospital, she would not have passed. So, I am, in fact, going to grant the directed verdict to Shoney's as to wrongful death only.

Video Record ("V.R.") 5/16/19 1:10:27-1:10:58.

The trial court then ruled that: (1) Shoney's could be held liable for Mrs. Seraphine's broken arm but not for wrongful death; and (2) Shoney's could not be held liable for punitive damages. The rest of the issues went to the jury. After deliberation, the jury entered an 11-1 judgment in favor of both Baptist (against whom Mr. Seraphine was permitted to proceed on a wrongful death claim) and Shoney's on liability grounds. Having found in favor of the defense solely on the basis of lack of liability, the jury did not consider the issues of apportionment or damages. In accordance with the jury's verdict, the trial court entered its judgment in favor of Shoney's and Baptist on June 11, 2019.

This appeal followed.

## II.   ANALYSIS

On appeal, Mr. Seraphine alleges the following counts of error:  (1) the trial court erroneously granted Shoney's motion for directed verdict on Mr. Seraphine's wrongful death claim; (2) the trial court abused its discretion in permitting improper testimony from one of Aramark's representatives; (3) the trial court abused its discretion by refusing to show the security footage of the Shoney's manager removing and replacing the floormat after Mrs. Seraphine's fall; (4) the trial court abused its discretion in refusing to allow Mr. Seraphine to use a "true replica" of Shoney's floormat as a demonstrative exhibit; (5) the trial court abused its discretion by prohibiting Mr. Seraphine's counsel from relying on "reptile" arguments; (6) the trial court abused its discretion by preventing Mr. Seraphine's counsel from making "conscience of the community" comments; (7) the trial court abused its discretion by prohibiting Mr. Seraphine's counsel from explaining legal concepts during *voir dire*; (8) the trial court abused its discretion by requiring Mr. Seraphine to present Dr. Johnson's testimony during his case-in-chief rather than as a rebuttal witness; and (9) the trial court abused its discretion by allowing Baptist to reference Dr. Yakkanti's role as doctor.  We address each argument below.

## A. *Wrongful Death Directed Verdict*

The trial court concluded that there was no evidence to support the theory Mrs. Seraphine's fall at Shoney's caused her death. When asked for clarification as to the grounds for directed verdict, the court elaborated as follows:

> Plaintiff's Counsel: Can you tell us, is your directed verdict because the plaintiff produced no evidence of the death being related or is it because of a superseding cause?
>
> Trial Court: Well, I think . . .
>
> Plaintiff's Counsel: I think for appellate purposes it's necessary to have that determination.
>
> Trial Court: I think it's a combination of both. That – how it was presented was two different things – that the cause was, as you presented . . . the theory of the case the entire time as I understood it to be was if the patient was moved quicker or to a different level of care, she would have survived. Your medical proof was exactly that . . . . You in fact asked [your expert witness] Dr. Scissors that question, that was the only question the restaurant asked during the entire trial of a medical expert – and I agree. That if she had been moved – it to me . . . became two different cases in that moment. Failure to diagnose . . . that we heard about today was this incredibly bad arteriosclerosis. I don't want to revisit all that. That's my decision. . . .
>
> Plaintiff's Counsel: I just want to make sure we have a clear record of what the basis is.
>
> Trial Court: Well, I don't know that we are going to get a clear record. Because I have never seen a case with this fact pattern and if someone shows up in the Court of Appeals and argues that there is a case on point – I want

the record to be clear that it was never presented to me on this particular fact pattern.

V.R. 5/16/19 2:48:16-2:49:30.

Mr. Seraphine's argument was that Mrs. Seraphine would not have been in the hospital had it not been for Shoney's negligent placement and maintenance of the floormat. In other words, according to Mr. Seraphine, Shoney's negligence set off the chain of events that led to Mrs. Seraphine's ultimate death.

The trial court's attempt to separate the initial injury from the death based on the intervening medical negligence by Baptist is not supported by our case law.

> The rule is that an injured person is required to use ordinary care and reasonable diligence to secure appropriate treatment of the injury; when he has exercised that care, he may recover damages to the full extent of his injuries, even though the doctor engaged for such treatment omits to use the most approved remedy, or the best means of cure, or fails to exercise as high a degree of care or skill as another doctor might have.

*Brown Hotel Co. v. Marx*, 411 S.W.2d 911, 915 (Ky. 1967). Stated another way, "[i]f the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, *irrespective*

*of whether such acts are done in a proper or a negligent manner*." RESTATEMENT

(SECOND) OF TORTS § 457 (1965) (emphasis added).

Although the trial court disclaimed knowledge of a similar fact

pattern, the comments to Restatement § 457 are directed at precisely this type of

factual scenario:

> *a. Additional harm from hospital or medical treatment.*
> The situation to which the rule stated in this Section is
> usually applicable is where the actor's negligence is the
> legal cause of bodily harm for which, even if nothing
> more were suffered, the other could recover damages.
> These injuries require the other to submit to medical,
> surgical, and hospital services. The services are so
> rendered as to increase the harm or even to cause harm
> which is entirely different from that which the other had
> previously sustained. In such a case, the damages
> assessable against the actor include not only the injury
> originally caused by the actor's negligence but also the
> harm resulting from the manner in which the medical,
> surgical, or hospital services are rendered, irrespective of
> whether they are rendered in a mistaken or negligent
> manner, so long as the mistake or negligence is of the
> sort which is recognized as one of the risks which is
> inherent in the human fallibility of those who render such
> services.
>
> *b. Risks incident to medical treatment.* It would be
> stretching the idea of probability too far to regard it as
> within the foresight of a negligent actor that his
> negligence might result in harm so severe as to require
> such services and therefore that he should foresee that
> such services might be improperly rendered. However,
> there is a risk involved in the human fallibility of
> physicians, surgeons, nurses, and hospital staffs which is
> inherent in the necessity of seeking their services. If the
> actor knows that his negligence may result in harm

sufficiently severe to require such services, he should also recognize this as a risk involved in the other's forced submission to such services, and having put the other in a position to require them, the actor is responsible for any additional injury resulting from the other's exposure to this risk.

*c.* If the actor's negligence results in harm to another which requires him to submit to hospital treatment, the actor is responsible for injuries resulting from the improper manner in which any member of the staff does his part in the normal treatment of his injuries. He is therefore as fully responsible for the negligent manner in which the nurses or clerical staff perform their part as he is for the negligent manner in which a physician or surgeon treats the case or diagnoses the injuries or performs an operation.

*Id.*

Our Supreme Court reiterated this principle in 1980, holding that if a plaintiff is harmed by a tortfeasor and put "in a position from which it was reasonable to seek . . . medical services," the original tortfeasor "is responsible for *any* injury to [the plaintiff] resulting from [the plaintiff's] exposure to the risk involved in these medical services." *Deutsch v. Shein*, 597 S.W.2d 141, 145 (Ky. 1980), *abrogated on other grounds by Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012). The "injury need only flow directly from the event." *Id.*

Mr. Seraphine consistently argued that "had it not been for the negligence of Shoney's, Mrs. Seraphine would not have been a patient of Baptist and there would have been no opportunity for subsequent medical negligence."

Appellants' Br. at 15. Additionally, Mr. Seraphine did present *some* evidence to the jury to support the notion that Mrs. Seraphine's initial injury sustained at Shoney's was aggravated or increased by Baptist's alleged medical negligence. Specifically, Mr. Seraphine offered evidence at trial that Mrs. Seraphine sustained an unrecognized traumatic injury during her fall. Dr. Johnson, one of Mr. Seraphine's expert witnesses, opined that Mrs. Seraphine sustained a splenic injury during her fall that resulted in a loss of blood. According to Dr. Johnson, CT scans of Mrs. Seraphine's abdomen and chest showed fluid adjacent to Mrs. Seraphine's spleen and rib fracture as well as signs of an unknown traumatic event that likely caused a splenic hemorrhage. Similarly, Mr. Seraphine's expert witness Dr. Corey also identified untreated and undiagnosed bleeding as causative factors in Mrs. Seraphine's death.

The trial court's belief that Mr. Seraphine presented "two different stories" was an inappropriate basis upon which to grant a directed verdict. Submitting a standard comparative negligence instruction to the jury for the wrongful death would have allowed the jury to make the determination regarding fault. *NKC Hosps., Inc. v. Anthony*, 849 S.W.2d 564, 569 (Ky. App. 1993).

Upon consideration of the law and evidence, we agree with Mr. Seraphine. The trial court erred in sustaining Shoney's motion for a directed verdict on the wrongful death claim. We must consider whether the error was

harmless in the context of this case.  *Lambert v. Franklin Real Estate Co.*, 37 S.W.3d 770, 775 (Ky. App. 2000); CR[3] 61.01.  "When considering a claim of harmless error under CR 61.01, the court determines whether the result probably would have been the same absent the error or whether the error was so prejudicial as to merit a new trial."  *CSX Transp., Inc. v. Begley*, 313 S.W.3d 52, 69 (Ky. 2010) (citations omitted).

With respect to Shoney's duty of care, the jury was instructed as follows:

> It was the duty of [Shoney's], and its employees to exercise ordinary care to keep its premises in a reasonably safe condition for use by its patrons, including Jane Carolyn Seraphine.
>
> You will find for the Plaintiffs if you are satisfied from the evidence that [Shoney's] failed to comply with its duty and that such failure was a substantial factor in causing [Mrs.] Seraphine's injuries.  Otherwise you will find for the Defendant, [Shoney's].

R. at 2039.  Eleven of the twelve jurors answered "no" on the following page when asked whether they believed "from the evidence that [Shoney's] failed to comply with its duties as explained in Instruction No. 2 such that it was a substantial factor in causing [Mrs. Seraphine's] injuries."  R. at 2040.

---

[3] Kentucky Rules of Civil Procedure.

Shoney's argues that any error in granting a directed verdict to it on the wrongful death portion of the claim is harmless because the jury determined that it did not breach its duties to Mrs. Seraphine. It reasons that because the jury determined that it did not breach any duties to Mrs. Seraphine, the jury would not have even had the occasion to reach the wrongful death portion of the jury instructions. In other words, because the jury determined there was no breach of duty by Shoney's, they never had to consider the issues of causation and damages where the wrongful death portion of the claim would have been relevant.

The Supreme Court of Kentucky confronted a similar issue in *Jewish Hospital & St. Mary's Healthcare, Inc. v. House*, 563 S.W.3d 626 (Ky. 2018). In that case, the estate of a decedent brought suit against a hospital after the decedent passed away from cardiac arrest secondary to a staph infection sustained while at the hospital. *Id*. at 628-29. The trial court directed a verdict against the decedent's doctor, an "empty-chair defendant," which the estate argued was reversible error. *Id*. at 631. Although our Supreme Court agreed that the directed verdict was erroneous, it ultimately held that the potential prejudices are "outweighed by the proof in the record that this instruction was harmless." *Id*. at 638. Namely, the estate's theory of the case was not affected because it had already repeatedly argued that, in addition to the hospital, the doctor was also at fault. *Id*. Moreover, our Supreme Court also found it persuasive that the jury stopped at the hospital's

- 16 -

liability instruction, never reaching the prejudicial instruction that followed. *Id.* The jury was not prejudiced by the erroneous instructions it presumably never read, and the trial court's granting of the directed verdict was harmless error. *Id.* at 638-39.

Admittedly, the trial court read through the entirety of the jury instructions prior to closing arguments and informed the jury that Shoney's was not liable for wrongful death. However, Mr. Seraphine argued the same theory on premises liability against Shoney's at closing as had been advanced for the entire duration of the trial, and the jury still deliberated on the issue of premises liability. Because the jury did not even find Shoney's liable on Mr. Seraphine's premises liability claim on that theory, they could not have found Shoney's to be liable for wrongful death. Based on *Jewish Hospital & St. Mary's Healthcare, Inc.*, we must conclude that the trial court's error of directing a verdict in favor of Shoney's on the wrongful death portion of Mr. Seraphine's claims was harmless. The jury determined that Shoney's did not breach its duty of care, making the remainder of the instructions with respect to Shoney's irrelevant.

## B. The Trial Court's Evidentiary Rulings

We now turn to Mr. Seraphine's various assignments of error with respect to the trial court's adverse evidentiary rulings. A trial court holds the position of "gatekeeper" in admitting and excluding evidence under the rules of

evidence. *See*, *e.g.*, *West v. KKI, LLC*, 300 S.W.3d 184, 193 (Ky. App. 2008). We will not overturn the trial court's evidentiary rulings absent an abuse of discretion. *See Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000).

### i. Aramark's Testimony

Mr. Seraphine contends the trial court abused its discretion in permitting Shoney's to call Rich Willett to testify on behalf of Aramark on two counts: (1) the trial court improperly allowed Shoney's to shift its duty of care to Aramark; (2) the trial court erroneously permitted Mr. Willett to present improper opinion testimony and failed to rectify the error by providing a limiting instruction to the jury regarding Aramark's role in the case.

Mr. Willett testified that Shoney's contracted with Aramark to provide and service its floormats. Mr. Willett detailed the history of the floormat at issue and explained how it was placed, serviced, cleaned, and inspected according to Aramark's standard quality control processes. According to Mr. Willett, this particular floormat had been in service since approximately 2012 and was removed, cleaned, and inspected every other week. Mr. Willett stated that if Aramark had discovered any kind of issue or problem with the floormat during its routine inspections, the floormat could have been removed from Aramark's inventory.

Mr. Seraphine objected to Mr. Willett being allowed to testify on the basis that the testimony was more prejudicial than probative. According to Mr. Seraphine, Mr. Willett's testimony had the potential to, and did in fact, confuse the jury regarding Shoney's ultimate liability. Mr. Seraphine contends that Mr. Willett's testimony allowed Shoney's to place the duty of inspecting and replacing the floormat on Aramark, despite the trial court's having previously denied Shoney's request to make Aramark a third-party defendant.

KRE[4] 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." "A proper balancing under KRE 403 requires that a trial court consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth." *Yates v. Commonwealth*, 430 S.W.3d 883, 897 (Ky. 2014) (citing *Barnett v. Commonwealth*, 979 S.W.2d 98, 100 (Ky. 1998)). "[I]n reviewing the trial judge's balancing under KRE 403, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable

---

[4] Kentucky Rules of Evidence.

probative force and its minimum reasonable prejudicial value." *Major v. Commonwealth*, 177 S.W.3d 700, 707 (Ky. 2005) (citation omitted).

The trial court ruled that Mr. Willett could testify to provide the jury with factual information regarding the placement and servicing of the floormat at issue. This information was highly relevant. It established the age of the floormat, its inspection history, and how and when it was last inspected prior to placement before the incident in question. The prejudice, if any, was minimal. Mr. Willett did not testify as to Shoney's standard of care and whether Shoney's fulfilled that duty, and he affirmed that it was the responsibility of the end user, in this case, Shoney's, to determine how and where the Aramark floormats were used. Shoney's did not argue that Aramark owed a duty of care to Mrs. Seraphine; rather, Shoney's argued that it had exercised ordinary care in using a floormat provided by Aramark, a commercial vendor. Furthermore, the jury instructions expressly provided that it was Shoney's and its employees' duty to exercise ordinary care to keep its premises in a reasonably safe condition for use by its patrons, including Mrs. Seraphine.

On the whole, we cannot conclude that the trial court abused its discretion when it allowed Mr. Willett to testify over Mr. Seraphine's objection. The testimony was relevant and probative and the prejudicial effect minimal.

Next, Mr. Seraphine contends that allowing Mr. Willett to testify as to the condition of the floormat violated KRE 702 as unqualified, undisclosed expert testimony.[5] The Kentucky Rules of Evidence limit lay witness testimony to that which is: "(a) [r]ationally based on the perception of the witness; (b) [h]elpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) [n]ot based on scientific, technical, or other specialized knowledge within the scope of Rule 702." KRE 701. A trial court may admit opinion or other testimony of a qualified expert regarding "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ," but only if it is "(1) . . . based upon sufficient facts or data; [and] (2) . . . the product of reliable principles and methods[.]" KRE 702.

Although the trial court was not asked during trial to conclude whether Mr. Willett was testifying as an expert, we are satisfied that Mr. Willett testified appropriately as a lay witness. Mr. Willett provided factually based testimony about the floormat at issue. He also testified about how Aramark cleans and inspects its floormats and how the drying process can occasionally damage the floormats. The information was based on Mr. Willett's personal experiences working at Aramark, the vendor Shoney's used to provide its floormats. In other

_____

[5] Mr. Seraphine broadly objected to Mr. Willett's testifying at all but did not specifically to any purported expert testimony he offered at trial beyond requesting a limiting instruction.

words, Mr. Willett testified in accordance with KRE 701 regarding his observations, or "perception," of the floormat based on his experience as an employee that sells and services floormats to Shoney's.

During Mr. Willett's testimony, Mr. Seraphine requested a limiting instruction be given to the jury mid-trial as to Aramark's role in the case, which the trial court deemed inappropriately timed. Mr. Seraphine did not submit a limiting instruction later on. While the trial court declined to include such a limiting instruction "in the middle of trial," it did not foreclose the possibility of including such an instruction in the final written jury instructions. However, Mr. Seraphine did not tender any written instructions to the trial court concerning Aramark. Ultimately, the trial court adopted the scope of duty instruction for Shoney's that Mr. Seraphine proposed, which expressly provided that it was Shoney's and its employees' duty to exercise ordinary care to keep its premises in a reasonably safe condition for use by its patrons, including Mrs. Seraphine. V.R. 5/10/19 1:20:43-1:21:05; R. at 2039.

We cannot agree with Mr. Seraphine that the trial court abused its discretion when it refused to admonish or instruct the jury regarding Aramark's duty or lack thereof during Mr. Willett's testimony. The trial court has broad discretion to control the order of testimony and the like. While the trial court could have explained to the jury the purpose of Mr. Willett's testimony at that time, it

chose not to do so. And, in the end, the trial court used the duty of care instruction submitted by Mr. Seraphine.

### ii. True Replica of Shoney's Floormat

The next issue on appeal is whether the trial court abused its discretion in granting Shoney's motion *in limine* excluding Mr. Seraphine's demonstrative evidence, which was labeled as a "new version of the floormat in question." R. at 1251. The trial court excluded the floormat at a pretrial conference on May 1, 2019, just days before trial,[6] at which point the mat had still not been produced as requested for inspection. The trial court reasoned that using the original mat avoided the issue of possible subsequent remedial measures. We affirm the trial court's exclusion of the floormat, albeit for a different reason.

"In Kentucky, models or objects are 'true replicas,' and admissible evidence for the jury to consider where they are properly identified and authenticated as evidence of the things which they represent and where the items they represent are relevant." *Jones v. Overstreet*, 371 S.W.3d 727, 735 (Ky. App. 2011); *Hogan v. Cooke Pontiac Co.*, 346 S.W.2d 529, 532 (Ky. 1961) (holding that a model wheel assembly of an automobile was admissible to show the functionality of the original wheel assembly in a products liability claim against the automobile

---

[6] The trial court, by Third Amended Civil Jury Trial Order, rescheduled the trial of this matter to begin on May 5, 2019, and then again to May 7, 2019.

dealer and manufacturer). As with any evidentiary issue, the decision whether to permit the use and presentation to the jury of a true replica lies within the sound discretion of the trial court. *Jones*, 371 S.W.3d at 735.

It is clear from the trial record that the use of a new mat as a demonstrative exhibit would have resolved some degree of confusion for the jury. Although the original floormat at issue was readily available for the jury's consideration and was in fact introduced as an exhibit by Mr. Seraphine's counsel, the jury was left questioning how the floormat should have laid on the floor. A juror submitted the following question: "Is there a floormat within this building that is the same as the mat in question so we could see how the mat should lay [sic] correctly? (nylon on rubber)." R. at 2036.

However, the trial court required that all exhibits be presented for inspection 30 days prior to trial. Despite this deadline, Mr. Seraphine served an amended exhibit list on April 10, 2019, indicating for the first time his intent to utilize a new version of the mat in question. Despite requests, Mr. Seraphine did not produce the new mat for inspection by the trial court or Shoney's. Although Mr. Seraphine claims that the jury was entitled to have his expert use the mat as a demonstrative aid to show the relative condition of the floormat at issue, his expert did not review or utilize the mat in forming his opinions. Allowing Mr. Seraphine to add a new demonstrative exhibit just days before trial could have disadvantaged

Shoney's at trial, especially where Mr. Seraphine did not provide a tenable explanation for his last proffer.  The trial court is vested with great discretion in setting its pretrial deadlines, and counsel who do not meet the deadlines do so at their own peril.  Under the circumstances, we cannot conclude that the trial court abused its discretion in disallowing the new floormat as a true replica.

### iii.  *Security Footage of Shoney's Manager Removing and Subsequently Replacing the Floormat*

Mr. Seraphine's next issue on appeal is whether the court abused its discretion in prohibiting his counsel from showing video clips of a Shoney's manager rolling up and removing the mat from the restaurant vestibule after Mrs. Seraphine fell during opening statements.  Mr. Seraphine contends that he should have been permitted to show the jury these video clips during his opening statement because of his claim for punitive damages.  According to Mr. Seraphine, the video helped to show the condition of the mat and ease of moving it.  Shoney's countered that the video would offer evidence of subsequent remedial measures taken as well as hearsay evidence.[7]

During the parties' final pretrial conference on May 1, 2019, the trial court ruled that it would not allow Mr. Seraphine's counsel to show the aforesaid

---

[7] Two men appear in the video, an unknown fireman and a Shoney's manager now deceased. They were not available to testify as to the content of the video and any assertions contained therein.

portions of video during opening statement, providing, "The incident itself is fair. The stuff after the fact subject to this is unfair. So, let me ask you to limit it to the moment in time. Again, the evidence is forecasting in the opening of what for sure is going to be." V.R. 5/1/19 12:00:30-45. The court further stated that it would determine the admissibility of the video segments during trial based on the context in which they were presented.

CR 43.02(a) provides that, during opening statements, "[t]he plaintiff must briefly state his claim and the evidence by which he expects to sustain it." The purpose of opening statements is to allow each party to summarize for the jury what its likely proof will be during the trial. *Polk v. Greer*, 222 S.W.3d 263, 265 (Ky. App. 2007). "An opening statement of counsel is prefatory to introducing evidence. Its purpose or function is merely to inform the judge and the jury in a general way of the nature of the case and the issues involved, particularly to outline what the attorney's client expects to prove." *Co-De Coal Co. v. Combs*, 325 S.W.2d 78, 79 (Ky. 1959). Our Supreme Court has previously noted that the use of evidence in opening statements must generally be limited because it has not yet been properly admitted into evidence. *Parker v. Commonwealth*, 241 S.W.3d 805, 808 (Ky. 2007).

Because the video segments in question were not guaranteed to be admissible, the trial court appropriately prohibited the use of the video showing the

mat's removal and replacement during opening. The trial court informed the parties that it would rule on admissibility of those video clips based on the context of Mr. Seraphine's case-in-chief. Ultimately, the videos in question were not shown to the jury, although Mr. Seraphine was permitted to cross-examine Shoney's representative regarding the video clips and the events depicted therein. Mr. Seraphine was able to cross-examine a Shoney's representative regarding the removal and subsequent replacement of the floormat and therefore was not prejudiced by the trial court's ruling. The trial court appropriately barred use of the video segments during opening, and Mr. Seraphine was not prejudiced because he was permitted to present the desired evidence to the jury in a different form during his case-in-chief.

### iv.  *"Reptile" Standards of Care*

Next, Mr. Seraphine contends that the trial court abused its discretion in granting Shoney's motion *in limine*, which Baptist joined, prohibiting the introduction of "reptile," or fictitious, safety rules different from those legally applicable in a premises liability case. Shoney's anticipated that Mr. Seraphine would attempt to create fictitious community standards of care in line with the "reptile" trial tactic outlined in *Reptile: The 2009 Manual of the Plaintiff's Revolution* by David Bell and Don Keenan. R. at 998. According to Shoney's, any line of questioning or argument from Mr. Seraphine's counsel suggesting the

"protecting against needless endangerment of customer safety is the standard of care" or that "protecting personal safety, community safety or patient safety" is the standard of care should be precluded as providing a false legal standard by which the care at issue in a premises liability case is to be judged.  R. at 998.

Medical providers are not required to make the "safest" possible choice regarding the circumstances; rather, they have the duty to "use the degree of care and skill expected of a competent practitioner of the same class and under similar circumstances."  *Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93, 113 (Ky. 2008), *as modified on reh'g* (Nov. 26, 2008) (citations omitted).

> Medical cases and duties of care for certain types of treatment must be based on expert testimony.  Although there are rules to be followed, including administrative regulations and in some cases statutes, the enumeration of specific duties is merely to amplify the requirements of the general duty to use ordinary care, and it does not expand such duties.

*Hamby v. Univ. of Kentucky Med. Ctr.*, 844 S.W.2d 431, 434 (Ky. App. 1992).

Mr. Seraphine argues that the trial court's ruling was improper because it was vague and prevented Mr. Seraphine from "arguing overall themes." Appellants' Br. at 11.  In doing so, Mr. Seraphine cites to a number of cases holding that a business's own safety rules are admissible.  *Current v. Columbia Gas of Ky., Inc.*, 383 S.W.2d 139, 142-43 (Ky. 1964), *overruled by Tuttle v. Perry*, 82 S.W.3d 920 (Ky. 2002) ("Appellants sought to introduce in evidence the rules

of appellee relating to standards of care as to inspection and venting of gas appliances . . . . Under these circumstances we decide the instant rules should have been admitted."); *Chesapeake & O. Ry. Co. v. Biliter*, 413 S.W.2d 894, 896 (Ky. 1967) ("[T]here was specific evidence of negligence in failure to make a close inspection of the roadbed, which inspection was required by the company's own safety rules and could reasonably be considered to have been required by common law standards."); *Ray v. Hardee's Food Sys., Inc.*, 785 S.W.2d 519, 520 (Ky. App. 1990) (citation omitted) ("It has been so often decided by this court that [a business's own] rules governing the conduct of a business may be read in a suit between the employer and [employee] by either party[.]").

We are troubled by the vagueness of the motion *in limine* and resulting ruling. A motion *in limine* should be directed at precise evidence, not prohibit counsel for adopting a trial strategy outlined in a book. However, in this case, we are not able to appreciate any prejudice. Mr. Seraphine introduced Shoney's own safety rules via Shoney's Employee Handbook and testimony regarding the safety and maintenance of floormats. His expert witness, Ms. Peterman, testified as to what she deemed the applicable safety standards in the industry regarding floormats, including the Building Code, Property Maintenance Code, the National Safety Council Data Sheet, and various American National Standards Institute standards. Mr. Seraphine's other expert witnesses also testified

as to their own opinions as to Baptist's standard of care. Mr. Seraphine does not explain on appeal what other standards or rules he was prevented from presenting at trial. Therefore, we find no abuse of discretion with respect to this assignment of error.

### v. "Conscience of the Community" Argument

Mr. Seraphine also claims that the trial court abused its discretion in prohibiting his counsel from arguing that the jury is the "conscience of the community."[8] Appellants' Br. at 12. Baptist moved *in limine* to prevent Mr. Seraphine's counsel from urging the jury "to 'send a message' to the Defendants, act as the 'conscience of the community', or other similar 'golden rule' style arguments in opening statement, closing argument, or at any other point during the trial that is clearly improper and would clearly seek to reference a 'societal impact' argument." R. at 1367-68. Baptist asserted that these comments would incite the jury to deliver a verdict under the influence of passion or prejudice.

Our Supreme Court has repeatedly stated in its opinions that the jury is the conscience of the community. *Fields v. Commonwealth*, 219 S.W.3d 742, 751 (Ky. 2007) (prosecutor may argue to the jury that it is the "conscience of the

---

[8] The portion of the pretrial conference cited in Appellants' brief does not address this issue. In fact, the trial court declined to rule on this issue at the time, stating that the parties could revisit the issue prior to closing. As such, we address the arguments made in the parties' motions *in limine*.

- 30 -

community" that will not tolerate the defendant's conduct); *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 385 (Ky. 1985) ("The conscience of the community speaks through the verdict of the jury, not the judge's view of the evidence."). Notably, these statements occur in cases of violent crimes or tort cases in which there are issues of outrageous misconduct necessitating punitive damages. *See Fields*, 219 S.W.3d 742 (holding that the prosecutor did not commit prosecutorial misconduct by referring to the jury as the conscience of the community in a robbery and assault case); *Horton*, 690 S.W.2d 382 (awarding punitive damages to homeowners whose house was destroyed in an explosion of natural gas); *Fryrear v. Commonwealth*, 471 S.W.2d 321, 324 (Ky. 1971) (regarding the jury as the conscience of the community when imposing the death sentence for murder).

However, "Kentucky courts have not drawn a bright line rule prohibiting such ["send a message" closing arguments], but rather have analogized them to remarks which tend to cajole or coerce a jury to reach a verdict that would meet the public favor." *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky. 2005). "[T]he difficult question nearly always is whether the probability of real prejudice from [such an argument] is sufficient to warrant a reversal, and in this respect each case must be judged on its own unique facts." *Stanley v. Ellegood*, 382 S.W.2d 572, 575 (Ky. 1964). Parties are expressly prohibited from

making "golden rule" arguments, whereby jurors are asked to imagine themselves or a loved one in the position of the plaintiff. *Caudill v. Commonwealth*, 120 S.W.3d 635, 675 (Ky. 2003) (citing *Golden Rule*, BLACK'S LAW DICTIONARY (7th ed. 1999)).

The present case does not involve outrageous misconduct, nor does it involve violent crime. In the present case, we find that the trial court did not abuse its discretion in preventing counsel from relying on potentially prejudicial lines of argument, particularly in light of the court's directed verdict on punitive damages.

### vi. Voir Dire

Mr. Seraphine also appeals the trial court's decision to refuse to allow his counsel to question potential jurors about certain applicable principles of law, including the burden of proof in a civil case. At the May 1 pretrial conference, Mr. Seraphine's counsel indicated that he intended to question potential jurors about the burden of proof in a civil case to find out if any potential jurors thought the "more likely than not" standard is unfair when a plaintiff is asking for millions of dollars in damages. He additionally argued that questioning the jury as to the difference between reasonable doubt and clear and convincing standards was appropriate to ensure that prospective jurors would follow the law. The trial court disagreed and precluded the parties from defining legal standards and "polling" the jurors or asking them to commit to certain theories.

A trial court has wide discretion in permitting and limiting the *voir dire* examination of prospective jurors in both civil and criminal cases. *Farmer v. Pearl*, 415 S.W.2d 358, 360 (Ky. 1967); *Rogers v. Commonwealth*, 315 S.W.3d 303, 306 (Ky. 2010). Although "a wide latitude is allowed counsel in examining jurors . . . , [t]he scope of inquiry is best governed by a wise and liberal discretion of the court," which "does not constitute reversible error unless clearly abused and when it appears that harmful prejudice has been caused thereby." *Webb v. Commonwealth*, 314 S.W.2d 543, 545 (Ky. 1958). "The principal purpose of *voir dire* is to probe each prospective juror's state of mind and to . . . allow counsel to assess suspected bias or prejudice." *Lawson v. Commonwealth*, 53 S.W.3d 534, 539 n.2 (Ky. 2001) (quoting *Thomas v. Commonwealth*, 864 S.W.2d 252, 259 (Ky. 1993)).

The trial court did not abuse its discretion by precluding parties from defining legal standards during *voir dire*, succinctly stating that the courtroom "is not a law school classroom." V.R. 5/1/2019 9:57:07-9:57:10. According to our Supreme Court, *voir dire* "is not an occasion for counsel to educate the juror panel regarding legal concepts, although competent trial lawyers might properly structure their questions to the panel in a way that achieves that end." *Rogers*, 315 S.W.3d at 307. While there are some circumstances in which it may be appropriate to introduce legal concepts to the jury, we cannot say that Mr. Seraphine has shown

that those circumstances were present in this case or that the trial court's limitations on *voir dire* necessarily worked to unduly or unfairly prejudice Mr. Seraphine.

Similarly, the trial court also appropriately ruled that parties could not "poll" the jury, or ask them to commit to certain theories during *voir dire*. It is "well-settled" under Kentucky law that it is "impermissible to ask *voir dire* questions designed to commit jurors to certain theories." *Sherroan v. Commonwealth*, 142 S.W.3d 7, 14 (Ky. 2004), *holding modified by Elery v. Commonwealth*, 368 S.W.3d 78 (Ky. 2012); *see also Woodall v. Commonwealth*, 63 S.W.3d 104, 116 (Ky. 2001) ("Questions are not competent when their evident purpose is to have jurors indicate in advance or to commit themselves to certain ideas and views upon final submission of the case to them."). In keeping with precedent, the trial court ruled that it would not permit polling of the jury, stating: "A polling means you're asking [potential jurors], 'If I prove X, will you do Y?' You cannot do that. There's no case anywhere that says you can." V.R. 5/1/2019 9:54:29-9:54:37. We find no abuse of discretion in the trial court's reasoning.

### vii. Rebuttal Witness

The next issue on appeal is whether the trial court abused its discretion by preventing radiologist Dr. Jamlik-Omari Johnson from testifying as a rebuttal witness at trial. Baptist contended that Dr. Johnson's opinion evidence

was not proper rebuttal evidence under CR 43.02 because it could have been presented in Mr. Seraphine's case-in-chief. The trial court ruled that Dr. Johnson could not be used as a rebuttal witness because his testimony could have been presented in the case-in-chief in support of Mr. Seraphine's original theory of the case.

CR 43.02 dictates the order of presentation of proof at trial. The party with the burden of proof must first produce and "exhaust his evidence before the other begins." CR 43.02(c). After the opposing party exhausts his case, the trial court may, under CR 43.02, permit the parties to rebut evidence "for good reasons in furtherance of justice[.]" CR 43.02(d). However, the Rule provides that it is within the court's power to regulate the order of proof so as to "expedite the trial and enable the tribunal to obtain a clear view of the whole evidence." CR 43.02(c). Consequently, it is well within the trial court's discretion to regulate the order of presentation of proof at trial. *Fraser v. Miller*, 427 S.W.3d 182, 184 (Ky. 2014); *Commonwealth, Dep't of Highways v. Ochsner*, 392 S.W.2d 446, 448 (Ky. 1965).

"Rebuttal testimony offered by the plaintiff should rebut the testimony brought out by the defendant and should consist of nothing which could have been offered in chief." *Ochsner*, 392 S.W.2d at 448 (quoting 53 AM. JUR. 107 (*Trial*, § 121)). Rebuttal evidence is evidence that "tends to counteract or overcome the

legal effect of the evidence for the other side." *Fraser*, 427 S.W.3d at 184 (quoting

*Reserve Loan Life Ins. Co. v. Boreing*, 157 Ky. 730, 163 S.W. 1085, 1087 (1914)).

The trial court acted within its discretion to require Dr. Johnson to

testify during Mr. Seraphine's case-in-chief because Dr. Johnson's testimony could

have been properly heard then. Even if such a ruling was in error, we believe it

was harmless since Mr. Seraphine was given the opportunity to introduce the

testimony at issue, and counsel could have explained its significance to the jury

during closing statements.

### viii. Statements Referencing Released Defendant Dr. Yakkanti

The final issue on appeal is whether the trial court erroneously

allowed Baptist's counsel to make statements[9] blaming Mrs. Seraphine's treating

orthopedic surgeon, Dr. Yakkanti, contrary to an agreed order prohibiting any

apportionment of fault to Dr. Yakkanti at trial.[10] As an initial matter, we note that

---

[9] Mr. Seraphine has identified three specific statements which he claims improperly shifted Baptist's duty of care to Dr. Yakkanti: (1) "If Dr. Yakkanti got that information about the arterial blood gases – he would have said to the nurse, 'I don't deal with that. I don't know what you're telling me. Can you call somebody else?' Or he would have called somebody else." V.R. 5/17/19 11:57:43-11:58:28; (2) "They think somehow they [the nursing staff] should have stepped into the shoes of Dr. Yakkanti and got her transferred to the ICU." V.R. 5/17/19 12:26:30-12:27:37; and (3) "Dr. Yakkanti was well aware of [the situation] – if he thought the information that he got from Kristina was bad information . . . . If he thought something was different, he would have called backup and said, 'Woah, I looked at the medical records. What are you talking about?' He didn't do that." V.R. 5/17/19 12:29:34-12:30:37.

[10] The agreed order stated, "It is further agreed and ordered that Defendant Baptist Healthcare System, Inc. will not seek an instruction at the trial of this matter as to the apportionment of any fault to Defendants Madhusudan R. Yakkanti, M.D., and Louisville Orthopedic Clinic and Sports

Mr. Seraphine did not contemporaneously object to any of the statements of which he now complains.

The statements to which Mr. Seraphine now objects were not testimonial but rather argumentative statements posed by Baptist's counsel during opening and closing arguments. According to Mr. Seraphine, the trial court allowed Baptist's counsel to speculate as to the quality of Dr. Yakkanti's treatment of Mrs. Seraphine.

"It has been the established rule that counsel in closing argument is given broad latitude to recite and interpret the evidence." *Owensboro Mercy Health Sys. v. Payne*, 24 S.W.3d 675, 678 (Ky. App. 1999) (citation omitted). Likewise, "[t]he parties are granted wide latitude in making their opening statements . . . ." *Jefferson v. Eggemeyer*, 516 S.W.3d 325, 338 (Ky. 2017) (citation omitted). Attorneys may "draw reasonable inferences from the evidence and propound their explanations of the evidence and why the evidence supports their respective theories of the case." *Garrett v. Commonwealth*, 48 S.W.3d 6, 16 (Ky. 2001) (citation omitted).

Mr. Seraphine did not contemporaneously object to the statements when they were made. Additionally, these were statements by counsel during

Rehabilitation Center, P.S.C." R. at 286-87. Baptist did not receive an apportionment instruction at trial.

opening and closing arguments. The jury was instructed that such statements are not evidence. Having reviewed the record, we are confident that any error in this regard was not properly preserved as well as harmless.

## III.   CONCLUSION

In light of the foregoing, we AFFIRM the Jefferson Circuit Court's judgment.

ALL CONCUR.


BRIEFS FOR APPELLANT:

Tad Thomas
Lindsay Cordes
Louisville, Kentucky

BRIEF FOR APPELLEE BAPTIST HEALTHCARE SYSTEM, INC.:

Patricia C. Le Meur
M. David Thompson
Noelle B. Haegele
Louisville, Kentucky

BRIEF FOR APPELLEE BULLITT VENTURES, INC. d/b/a SHONEY'S RESTAURANTS OF KENTUCKY:

David K. Barnes
Louisville, Kentucky